Brandon J. Mark, USB #10439
Gregory H. Gunn, USB #15610
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
BMark@parsonsbehle.com
DNeilson@parsonsbehle.com
GGunn@parsonsbehle.com
ecf@parsonsbehle.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, UTAH DIVISION

| | |
|---|---|
| HOLLY McCLURE, Individually and as a Parent and Natural Guardian of T.M and M.M., MARK McCLURE, Individually and as a Parent and Natural Guardian of T.M and M.M., <br><br> Plaintiffs, <br><br> vs. <br><br> RICHARD SAUNDERS, in his Official Capacity as Executive Director of Utah Department of Health; SUMMIT COUNTY BOARD OF HEALTH; RICHARD BULLOUGH, in his Official Capacity as Health Director of Summit County Health Department; CHRIS CHERNIAK, in his Official Capacity as Chair of Summit County Health Department; DR. SYDNEE DICKSON, in her Official Capacity as State Superintendent of Public Education; PARK CITY SCHOOL DISTRICT; DR. JILL GILDEA, in her Official Capacity as Superintendent of Park City School District; PARK CITY SCHOOL DISTRICT BOARD; and ANNE PETERS, ANDREW CAPLAN, WENDY CROSSLAND, KARA HENDRICKSON and ERIN GRADY, in their Official Capacities as members of Park City School District Board, <br><br> Defendants. | **COMPLAINT** <br><br> Case No. 2:21-cv-00148-CMR <br><br> Magistrate Judge Cecilia M. Romero |

Pursuant to 42 U.S.C. § 1983 and the United States Constitution, Plaintiffs Holly McClure and Mark McClure, as the parents and guardians of T.M. and M.M., minor children, complain as follows:

## I.   INTRODUCTION AND BACKGROUND

### A.   The Utah Department of Health's Order permitting schools to implement mandatory COVID-19 testing as a condition of in-person learning is an unconstitutional invasion of rights. The Court should enjoin Defendants from requiring mandatory testing as a condition of in-person learning.

1.      The United States Constitution and Utah Constitution provide a number of individual rights that are generally protected from state intrusion unless certain constitutional safeguards are satisfied.

2.      Among these are the rights to be treated equally with regards to access to in-person public education; to a zone of privacy about healthcare decisions, including to refrain from undergoing unnecessary or experimental medical testing; to due process of law before fundamental government benefits—such as the right to a public education—are withheld; the rights of parents to make medical decisions for their minor children; and, fundamentally, the right to be free of state coercion to "consent" to testing that is, in operation and in effect, contrary to prevailing medical and scientific guidelines, including the very authorities cited as support for that policy.

3.      The Utah Department of Health's current version of the Test to Stay program—which allows individual schools and school districts to mandate the use of experimental rapid antigen testing on non-symptomatic children and adolescents for COVID-19 as a condition to receive in-person public education—violates all these constitutionally protected rights. And it does so without meeting any of the constitutional safeguards, including even the most basic rational basis standard.

4.      This Court should enjoin Defendants from continuing to implement or enforce any policy that mandates the testing of non-symptomatic students as a condition of access to in-person public education.

**B.      Background: COVID-19 and Utah's School System.**

5.      On or about December 31, of 2019, the World Health Organization ("WHO") was informed of unknown pneumonia type medical cases emerging in Wuhan City, Hubei Province, China. On or about January 7, 2020, the causative agent of these infections was identified as a novel coronavirus SARS-CoV-2, or COVID-19, the clinical manifestation of SARS-CoV-2.

6.      Since then, COVID-19 has spread throughout the globe, leaving a wake of economic and social destruction in its path.

7.      On January 21, 2020, then Utah Governor Gary Herbert issued the first of many executive orders, Executive Order 2020-1, declaring the COVID-19 pandemic a state of emergency for the great State of Utah.

8.      In conjunction with state executive orders issued by the governor of Utah, the Utah Department of Health (sometimes "UDOH") has also issued orders from time-to-time purportedly pursuant to its authority under Utah Code §§ 26-1-10, 26-23b-104(3)(a), 26-23b-102(4) and (6), 26-1-30(3), (5), and (6).

9.      Both the Governor and UDOH have issued executive orders and Utah public health orders involving directives for all school age children in K-12 schools. These Orders include the following:

3

a.     The Governor's Coronavirus Directive for Utah "Stay Safe, Stay Home," entered March 27, 2020, in which the Governor directed children to "not attend school outside the home." This was updated April 17, 2020.

b.     Utah Public Health Order ("UPHO") 2020-10, entered July 17, 2020, mandating, among other things, all individuals to wear face masks or face coverings to mitigate the transmission of COVID-19, updated August 14, 2020 (UPHO 2020-11), updated October 14, 2020 (State Public Health Directive, Public Health Directive for Face Masks), which was updated December 17, 2020 (UPHO 2020-28).

c.     Utah Public Heath Orders 2020-19 through 2020-27, UPHO 2021-3, and UPHO 2021-5, which directed local education agencies to comply with the requirements of the "Planning Requirements and Recommendations for K-12 School Reopening," created by the Utah State Board of Education.

d.     UPHO 2021-7 ("Order 2021-7") entered February 24, 2021, which replaces the previous Utah Public Health Orders, delegates authority to local education agencies ("LEA"), such as Defendant Park City School District, to decide in consultation with "local health department[s]" whether to implement Test to Stay once the "outbreak threshold" has been satisfied. (Order 2021-7, §10.)

e.     Contrary to Centers for Disease Control and Prevention ("CDC") guidance for the use of voluntary in-school testing, Order 2021-7 defines the "outbreak threshold" based not on broader community spread, but instead based on the purported number of positive tests (presumably PCR tests) at a particular school. As discussed below, using purported school cases as the

4

outbreak threshold for school-based testing is ***contrary to CDC guidance*** (which says such testing should be voluntary in any event), even though the policy is purportedly based on CDC directives.

f.      Once the school-based outbreak threshold is triggered, Order 2021-7 provides that an LEA should implement Test to Stay (called a "testing event") if it determines with the local health department "that a testing event is appropriate." (*Id.*)

g.      So even if the outbreak threshold is met, Order 2021-7 does not provide that LEAs should automatically move to implement Test to Stay.

h.      But Order 2021-7 provides ***no criteria, guidelines, or other guardrails*** to LEAs regarding their decision whether, or how, to implement Test to Stay.

i.      Accordingly, Test to Stay has been implemented haphazardly in Utah, with school districts in relatively lower transmission areas requiring students to be tested to stay in school while school districts in relatively higher transmission areas just a short drive away have not required invasive rapid antigen testing as a condition of attending school.

j.      Once an LEA implements Test to Stay, Order 2021-7 provides that the LEA "shall require a student to participate in virtual or remote learning if the student does not or is unable to participate in testing of any kind" and either less than 60% of students participate in the testing or the "resulting percent positivity from those who participated in the testing event is equal to or greater than 2.5%." (*Id.*)

k.      Even though students must be excluded from school under Order 2021-7's version of Test to Stay if they decline experimental rapid antigen testing, teachers and school staff members may opt out of testing but ***must*** nevertheless continue to perform their job duties ***in-person***. (The UDOH School Manual Website says that "[t]eachers and staff are expected to

continue their normal job duties in-person if they choose not to get tested ….") In other words, there is not mandatory testing of teachers and staff, but there is for the students they come in contact with. Given that all the science known about COVID-19 concludes that teachers and staff, i.e., adults, are far more likely than students, i.e., children, to infect others with the disease, Test to Stay's testing provisions are exactly backwards.

10.     Along with Order 2021-7, the Utah Department of Health produced a "COVID-19 School Manual" (hereinafter "School Manual", attached as Exhibit B to the Motion for Preliminary Injunction filed contemporaneously herewith), which the UDOH updated on March 1, 2021, to provide, in part, further information about the Test to Stay policies authorized by Order 2021-7.

11.     As the School Manual explains, "Test to Stay" is carried out by individual schools to supposedly test for school outbreaks. An "outbreak" is unhelpfully defined as "when a disease happens in higher numbers than expected." When a school meets the outbreak thresholds set in Order 2021-7, the LEA can decide to either: (a) offer rapid antigen testing for all students and staff, or (b) take other actions as decided upon by the LEA to mitigate the spread of COVID-19 consistent with public health guidance. (*See* School Manual at 51.) Order 2021-7 does not define or otherwise provide guidance on what other actions LEAs may take instead of Test to Stay or what criteria or factors they should use in deciding whether to implement the Test to Stay policies or some other, lesser intervention. (Attached as Exhibit A to the Motion for Preliminary Injunction filed contemporaneously herewith.)

12.     For schools with more than 1,500 students and staff, the outbreak threshold is 1% of the school population. For schools with 1,500 or fewer students and staff, the outbreak threshold is 15 cases. (*See* Order 2021-7; School Manual at 50.)

4817-5021-7951.v2

13.     Schools are instructed to use a "rolling 14-day window to determine if an outbreak threshold has been reached." (*See* School Manual at 51.)

14.     Schools are also instructed also to get parental consent prior to testing, but the School Manual offers no guidance concerning what form such parental consent should take or how much information about the proposed required rapid antigen testing must be disclosed to parents as part of that process. Nor does Order 2021-7 or any other known UDOH guidance provide restrictions on the storage or future use of test-related information. (*See* School Manual at 50; *see also* Order 2021-7.)

15.     Under the Test to Stay of Order 2021-7, students who are offered rapid antigen testing and test positive for COVID-19, must isolate at home, even if they had ***no*** symptoms before the test. The student may return to in-person learning after they are done with their isolation period. (*See* School Manual at 52.)

16.     Students who are offered rapid antigen testing *and* test negative for COVID-19, *and* have not been in close contact with a person who tested positive, *and* do not have symptoms of COVID-19, may continue in-person learning. (*See* School Manual at 52.)

17.     According to the School Manual, students who opt not to get tested must move to virtual or remote learning for at least ten days if fewer than 60% of students in the school participate in the testing event, *or* if the percent of positive tests among those who participate in the testing event is 2.5% or greater, even if they have had no symptoms and haven't been in contact with anyone who has tested positive. (*See* School Manual at 52.)

**C.** **Defendants Implement Mandatory Test to Stay Policies at Plaintiffs' Children's Schools.**

18.     Treasure Mountain Junior High school and Park City High School both implemented Test to Stay programs beginning January 25, 2021. (See letter from Caleb Fine, Principal at Treasure Mountain Junior High, hereinafter "Fine Letter", attached as Exh. 1 to Declaration of Holly McClure, hereinafter "McClure Decl.", filed contemporaneously herewith.)

19.     The Test to Stay program used rapid BinaxNOW COVID-19 testing, providing results within fifteen minutes. As part of Test to Stay, students and staff are expected to participate in COVID-19 testing at least once every 14 days, but only students must stay home if they refuse—not teachers and staff that refuse. (See letter from Park City School District, dated January 12, 2021, attached as Exh. 1 to McClure Decl.) The schools test approximately 100 students per day on a two-week rotation. (*Id.*)

20.     Parents and/or guardians only options were to consent to testing or consent to remote learning. (*Id.*) At this point the state continues to make changes.[1]

21.     There is no option for any parents or students to opt out of continuing COVID-19 testing while keeping their healthy, non-symptomatic children at school for in-person learning.

22.     The consent form requests the following information from the student and their parents: name; date of birth; student identification number; sex; ethnicity; race; street address; phone number; email address; if they have been tested for COVID-19 before; if they are employed in healthcare; if they have any of the following symptoms fever or chills, cough, shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, new loss of taste or smell, sore

---

[1] E.g., the School Manual was updated as recently as March 1, 20201. As recent as March 9, 2021, parents with children at PCHS were notified of further changes to the program, infra, ¶ 39.

throat, congestion or runny nose, nausea or vomiting, or diarrhea; if they have ever been hospital-ized because of COVID-19; if they have been admitted to the Intensive Care Unit (ICU) because of COVID-19; if they are a resident in a congregate care setting; and if they consent to receive their COVID-19 test through email. All this information is disclosed to the Utah Department of Health. (See School COVID Testing Registration Form attached hereto as Exhibit A.)

23.    No further information is provided about how long UDOH will retain this infor-mation or with whom such information may be shared, any other restrictions on the UDOH's fur-ther disposition of this sensitive, private information, or how the it may use, or share, the infor-mation in the future.

**D.    T.M.'s and M.M.'s Refusal to Consent to Continuing COVID-19 Testing and Subsequent Isolation and Denial of In-Person Education**

24.    Plaintiffs' have two children, T.M. and M.M., who are both currently enrolled in the Park City School District ("PCSD"). T.M. is currently enrolled in Treasure Mountain Junior High ("TMJH") and M.M. is currently enrolled in Park City High School ("PCHS").

25.    Plaintiffs take an active role in their children's education. Plaintiffs strongly believe that in-person schooling is the best option for their children and have long pushed for in-person schooling since the COVID-19-related shutdowns started.

26.    Plaintiffs are uncomfortable with the compelled nature of Order 2021-7's Test to Stay protocols. Plaintiffs have concerns regarding:

a.    Who is receiving the medical information contained in both the consent form and the medical information generated by the continuing COVID-19 tests?

b.    How is this information stored, and what restrictions (if any) exist on the future and further use of this information?

4817-5021-7951.v2

c.     Which testing facilities are performing the tests?

d.     What genes are detected to be considered positive for COVID-19?

e.     What controls are in place to confirm a "positive" COVID-19 test?

f.     Are all the testing facilities are following a standard protocol, and if yes, what that protocol is (i.e., are all tests and results treated the same?)?

g.     How does the test determine infectiousness?

h.     How did the State of Utah and Utah Department of Health decide on the "15 case outbreak threshold" and why is that a meaningful metric?

i.     Does the 15-case outbreak threshold consider false positives?

j.     Why is the State of Utah unnecessarily hampering children's education when children are the least likely to be impacted from a positive COVID-19 test?

k.     Why is the State of Utah allowed to determine who is "sick" even when those children have no symptoms, taking this decision out of the hands of their parents?

l.     Why has the State of Utah never measured or considered the role of natural immunity in "stopping the spread" of COVID-19?

m.     How does the Test to Stay testing program measure or account for natural immunity—either pre-existing cross-reactive immunity from other coronaviruses or acquired immunity from infection with and recovery from COVID-19 more than 90 days after a positive PCR or antigen test?

n.     Where is the State of Utah's evidence that asymptomatic spread is significant amount the K-12 cohort and has a clear causal correlation to severe illness in those most at-risk for hospitalization and death?

10

27.     Plaintiffs strongly believe in their rights as parents to direct the medical care of their children, zealously protect those rights, and seek to vindicate the rights of all parents to make medical decisions for their children.

28.     On January 12, 2021, Plaintiffs were notified by TMJH, PCHS, and the PCSD that each school had exceeded the state-defined threshold of 15 cases per campus, would be going to remote learning for a period of 10 days, and, upon return from remote learning, would be implementing the state's Test to Stay program for those who wanted to continue with in-person learning. Test to Stay was implemented as an addition to the existing measures implemented since start of school "stop the spread"—masking, social distancing, cleaning high-touch surfaces, quarantining, and contact tracing.

29.     Plaintiffs were notified that under the Test to Stay program, every student in any PCSD school would have to be tested every fourteen days. Plaintiffs were further notified that TMJH would test 100 students per school day and that PCHS would test 150 students per school day.

30.     Between January 20 and January 23, 2021, through a series of letters and emails, Plaintiffs informed Defendant Dr. Jill Gildea, Superintendent of PCSD, Mr. Roger Arbabi, school principal of PCHS, and Mr. Caleb Fine, school principal of TMJH, that (1) they stringently objected to the compelled testing of their children, (2) they did not consent to have T.M. and M.M. tested for COVID-19, and (3) notwithstanding their lack of consent to the testing, they desired their children to continue in-person learning and not transition to remote learning.

11

31.     On January 25, 2021, both T.M. and M.M. returned to school with all other students that did not consent to remote learning. On January 25, 2021, both T.M. and M.M. returned to school with all other students, including with others who had not consented to testing.

32.     T.M. and M.M. were both scheduled for COVID-19 tests on January 25, 2021, by their respective schools. Neither T.M. nor M.M. attended their appointments. M.M. received a second testing date of February 8, 2021.

33.     On February 3, 2021, Plaintiff Holly McClure received a phone call from Mr. Caleb Fine, school principal for TMJH, notifying her that T.M. had been removed from her class and isolated on campus because of T.M.'s missed COVID-19 test and Plaintiffs' refusal to consent to the continuing COVID-19 testing of T.M. Mr. Fine further notified Mrs. McClure that according to the LEA's implementation of Test to Stay, T.M. would be placed in isolation every day that Plaintiffs brought T.M. to school without consenting to the continuing COVID-19 testing.

34.     During T.M.'s isolation, T.M. was placed in a room with a teacher and directed to stay there throughout the day. T.M. was informed that she would not be allowed to visit the restroom between classes and would not be allowed to each lunch with any students. A computer was set up for T.M. and she was directed to start school through remote learning, despite the fact that Plaintiffs' had not consented to remote learning.

35.     On February 8, 2021, M.M. missed her second COVID-19. M.M. was then removed from her class and placed at a desk in a hallway inside the administrative wing of the school. Mr. Roger Arbabi, school principal of PCHS contacted Mrs. McClure and informed her of M.M.'s isolation because of Plaintiffs' refusal to consent to continued COVID-19 testing. When Mrs. McClure arrived at the school to pick up M.M., Mr. Arbabi notified Mrs. McClure that the

4817-5021-7951.v2

Plaintiffs' options were either to consent to the continuing COVID-19 testing or consent to enroll-ment in distant learning. If Plaintiffs continued to send M.M. to school without consenting to con-tinuing COVID-19 testing, Mr. Arbabi would continue to isolate M.M.

36.     Every school day after the isolation of T.M. and M.M., Plaintiffs would email TMJH's and PCHS's attendance email notifying them that they do not consent to remote learning and are not sending their children to school under duress.

37.     On February 25, 2021, Plaintiffs received a call from both Mr. Fine, principal of TMJH and Mr. Arbabi, principal of PCHS informing them that T.M. and M.M. can return to in-person learning due to a change in the Test to Stay allowing in-person learning if 60% of the student body is participating in the Test to Stay program.

38.     T.M. and M.M. were scheduled COVID-19 test appointments for March 1, 2021. T.M. and M.M. did not show up for their appointments.

39.     As of March 9, 2021, parents with children at PCHS (or within PCSD?) were noti-fied the Test to Stay program is "on hold" due to "significant drop in cases on campus and a reduced positivity rate in Summit County." The most recent round of testing for the entire student body occurred on March 5, 2021.

40.     "Put on hold" does not indicate Test to Stay has ceased entirely. Indeed, the policy could be reimplemented, apparently at any moment, if community or campus positivity rates begin to rise.

## II.   **COVID-19 AND CHILDREN**

41.     Much has been learned concerning COVID-19 and how it affects children since the original outbreak.

42.     That science is known to Defendants, who purport to rely upon government author-ities, such as CDC, who have summarized the state of the science into recommendations for those in Defendants' position. (*See generally* School Manual (citing CDC guidance).)

43.     But according to the CDC and other sources supposedly relied on by Defendants to develop Test to Stay for Order 2021-7, almost nothing about Test to Stay comports with the guid-ance from those sources, which *is* based on the science known about the disease.

**A.     First, COVID-19 Poses a Low Risk to Children.**

44.     According to the CDC, "[a]lthough children can be infected with SARS-CoV-2, . . . less than 10% of COVID-19 cases in the United States have been among children and ado-lescents aged 5–17 years." (Centers for Disease Control and Prevention, *Transmission of SARS-CoV-2 in K-12 schools*, updated Feb. 12, 2021.)

45.     The CDC says that "[c]ompared with adults, children and adolescents who have COVID-19 are more commonly asymptomatic (never develop symptoms) or have mild, non-spe-cific symptoms," that "[c]hildren are less likely to develop severe illness or die from COVID-19," and that "rates of severe outcomes from COVID-19 including mortality and hospitalization in school-aged children are low." (*Id.*)

46.     By the CDC's own account, "[e]vidence from several studies suggests that children and adolescents may be less commonly infected with SARS-CoV-2 than adults." (*Id.*)

**B.     Transmission of COVID-19 From Child to Adult or Even Child to Child is Rare.**

47.     Importantly, the CDC has found that "[b]ased on the data available, in-person learn-ing in schools has not been associated with substantial community transmission" of COVID-19. (*Id.*)

14

48.     Furthermore, in-person schooling is not causing further community spread—in other words, in-person learning is not causing COVID-19 problems in the wider community. As the CDC notes, "[i]ncreases in case incidence among school-aged children and school reopenings do not appear to pre-date increases in community transmission." (*Id.*)

49.     Indeed, the CDC put a rather point on this, noting that

> studies have found that it is possible for communities to reduce incidence of COVID-19 while keeping schools open for in-person instruction. A study comparing county-level COVID-19 hospitalizations between counties with in-person learning and those without in-person learning found no effect of in-person school reopening on COVID-19 hospitalization rates when baseline hospitalization rates were low or moderate. The association between COVID-19 incidence and transmission in school settings and levels of community transmission underscores the importance of controlling disease spread in the community to protect teachers, staff, and students in schools.

(*Id.* (footnotes omitted).)

50.     Moreover, while Order 2021-7's Test to Stay *does not* mandate that teachers and staff be tested before attending school, the CDC has found that "[w]hen outbreaks occur in school settings, they tend to result in increased transmission among teachers and school staff rather than among students." (*Id.*) Indeed, the CDC says that "[e]vidence suggests that staff-to-staff transmission is more common than transmission from students to staff, staff to student, or student to student." (*Id.*) The CDC concludes that, "[t]herefore, school interventions should include measures to reduce transmission among staff members." Yet Order 2021-7's Test to Stay completely exempts teachers and staff—those most likely to contract, spread, and become ill from the disease—from the mandated testing. This is entirely backwards.

51.     Even when infectious students come to school, the CDC notes that the "[f]indings from several studies suggest that SARS-CoV-2 transmission among students is relatively rare." (*Id.*) Indeed,

> [s]everal contact tracing studies have found limited student-to-student transmission in schools. A study of factors associated with SARS-CoV-2 infection among children and adolescents in Mississippi found that school attendance was not associated with a positive SARS-CoV-2 test result. . . .  The evidence to date suggests that staff-to-student and student-to-student transmission are not the primary means of exposure to SARS-CoV-2 among infected children. Several studies have also concluded that students are not the primary sources of exposure to SARS-CoV-2 among adults in school settings.

(*Id.*)

52.     Notably, the "CDC's school guidance for COVID-19 emphasizes 5 key mitigation strategies: consistent and correct use of masks, physical distancing, handwashing and respiratory etiquette, cleaning and ventilation, and contact tracing in combination with isolation and quarantine." (*Id.*) None of those key mitigation strategies involves a policy even remotely resembling the mandatory testing required by Order 2021-7's Test to Stay policy.

**C.     Remote Learning Poses Potential Irreparable Harm to Children, as Utah Has Acknowledged.**

53.     Even though Order 2021-7's Test to Stay forces students who have no symptoms to be tested or forego in-person instruction, the School Manual itself recognizes the deleterious effects of remote learning as compared to in-person education.

54.     According to the Utah Department of Health's own School Manual, in-person schooling instruction is far superior for everyone—students, teachers, and the wider community. The first substantive page of the School Manual declares as its first statement that it is "**important**

16

**to open schools for in-person instruction**" and that "[s]chools play an essential role in the infra-structure and well-being of our state and our communities." (School Manual at 4 (emphasis in original).)

55.     The UDOH's School Manual goes on to acknowledge that "when they are in school, children benefit from important routines, structure, and support services," that "[s]chools are essential for the economic health of communities," and that "[s]chools give jobs to teachers and other employees and allow parents, guardians, and caregivers to be able to work." (*Id.*)

56.     Moreover, as study after study has shown, "[s]chools provide critical psychological, mental, and behavioral health services to children who may not have access to these services outside of school (such as psychological counseling, and other mental health and behavioral assessments)." (*Id.*) In short, Utah's children need in-person public education—the COVID-19 pandemic has revealed just how critical in-person education is to their well-being.

57.     As UDOH agrees, "[i]n-person instruction allows teachers and students to communicate better" and "provides students with critical academic services which are not always available or accessible if students are not in school," including "school-based tutoring, special education, and other specialized learning supports." (*Id.*)

58.     As the UDOH's own School Manual acknowledges, "[s]ocial interaction for children in grades K-12 is important not only for emotional wellbeing, but also for children's language, communication, social, and interpersonal skills," and "[w]hen children are out of school, they may be separated from their social network and peer-to-peer social support." (*Id.* at 5.)

59.     In short, UDOH admits that remote education puts students "***at greater risk for poor health and educational outcome***." (*Id.* (emphasis added).)

17

60.     Nevertheless, as discussed in further depth below, UDOH's's mandatory Test to Stay program imposes all these risks and adverse outcomes on healthy students without any symptoms of, or known exposure to, COVID-19.

**D.     The COVID-19 Tests Employed by the School Districts are Faulty and Inaccurate.**

61.     Test to Stay uses frequent, universal testing SARS-CoV-2, including with quarantine of those with a positive result, as a strategy to address COVID-19.

62.     As experts in such testing have warned, however, "[t]here are, however, several potential challenges or problems with this strategy, including the consequences of incorrect test results, difficulties with adherence to testing, and the questionable accuracy of such tests for detection of infectious people. High-quality outcome data demonstrating the efficacy of this testing strategy are needed before widespread implementation. Accordingly, it is premature to strongly advocate for such a testing strategy, as the adverse consequences and costs may outweigh any benefits." (Declaration of Dr. Matthew Pettengill ("Pettengill Decl."), at ¶ 13, filed contemporaneously herewith.)

63.     Even though "[d]uring the summer of 2020, more than 600,000 SARS-CoV-2 tests were performed per day in the United States, and the United States had the 2nd highest per-capita rate of testing in the world among the countries for which data are available," it also had "the highest number of positive results and deaths." (*Id.* at ¶ 14.)

64.     As one expert, Dr. Matthew Pettengill has observed,

> [m]any countries have dramatically reduced community spread of COVID-19 without the scale of per-capita testing currently available in the United States. For example, during the summer Canada had less than half of the U.S. per-capita testing capacity and dramatically lower per-capita rates of transmission (*see* the Johns Hopkins

18

database cited above). Large-scale testing does not appear to have
been the key to successful transmission control in other countries.

(*Id.* at ¶ 15.)

65.    According to the CDC, the sensitivity of the rapid antigen tests used by Test to Stay

"is generally lower than most NAATs [aka PCR testing]. The antigen level in specimens collected

either before symptom onset, or late in the course of infection, may be below the limit of detection

of virus of the test. This may result in a negative antigen test result" even when a person is conta-

gious. (Centers for Disease Control and Prevention, *Interim Guidance for Antigen Testing for

SARS-CoV-2*, Updated Dec. 16, 2020.) In light of how inaccurate current PCR/NAATs tests are,

as discussed more below, this is a powerful indictment of the tests Defendants are using here.

66.    Moreover, and somewhat perversely, according to the CDC "false positive results

will occur, especially when used in communities where the prevalence of infection is low. . . . In

general, the lower the prevalence of infection in the community, the higher the rate of false positive

test results." (*Id.*)

67.    Indeed, the results of an antigen must be "interpreted" to determine whether a pos-

itive result is clinically meaningful. The CDC provides that some considerations that should be

evaluated when determining whether a positive test is an "actual" positive case are "the prevalence

of SARS-CoV-2 infection in that particular community (positivity rate over the previous 7–10

days or the rate of cases in the community), and the clinical and epidemiological context of the

person who has been tested." (*Id.*)

68.    Notably, the CDC's guidance specifically says that the "evaluation of an antigen

test result should consider whether, and if so the length of time, the patient has experienced symp-

toms," but Test to Stay requires testing of every student—regardless of whether the student has

4817-5021-7951.v2

experienced any symptoms whatsoever. In other words, according to the CDC's guidance, a positive antigen test without symptoms is virtually meaningless.

69.     In fact, the CDC says that due to known "concerns about false positive results when pretest probability is low, a positive antigen test result . . . should be followed by a confirmatory NAAT," recognizing that a positive antigen test requires ***further and more*** invasive testing to actually confirm the case is actually positive with a PCR test (which is itself flawed, as discussed below).

70.     As Dr. Pettengill notes,

> [m]ost of the rapid SARS-CoV-2 / COVID-19 tests currently available are antigen-based tests. Available studies have found that most SARS-CoV-2 antigen tests to have relatively high specificities, generally in the range of 99 to 99.9%, meaning that 0.1% to 1.0% of all tests on patients who do not have COVID-19 will test falsely positive. When prevalence is low, however, this can still lead to a high percentage of positive test results that are falsely positive, meaning the test will have a low positive predictive value or low confidence in positive results.

(Pettengill Decl. at ¶ 16 (discussing recent studies).)

71.     Dr. Pettengill has also observed that "[a]ccording to data acquired from Johns Hopkins University" for Summit County, Utah, and based on new "infections per day for the period from February 19 through March 4, 2021," "the prevalence of documented active and likely transmissible SARS-CoV-2 of approximately 70 individuals per day" in Summit County. (*Id.* at ¶ 17.)

72.     That "indicates that it is highly unlikely that true prevalence exceeds 0.5% of the county population," and, if true, and the "specificity of the test utilized is 99%" (as recent research indicates for asymptomatic children, then "***the majority of positive results in this population will be falsely positive***." (*Id.* at ¶ 18 (citing recent studies).)

73.     Although advocates for frequent antigen testing contend that despite the insensitivity of the tests, they still detect people who are infectious and have high levels of virus. But even that claim is unsupported by research. For example, "one antigen test was recently found to detect only 82% of nasopharyngeal samples with threshold cycle (CT) values below 25 in a group of well-validated NAATs for SARS-CoV-2," which shows "this antigen test does not reliably detect samples that are likely to contain high levels of SARS-CoV-2." (*Id.* at ¶ 21.)

74.     Indeed, because they have not been fully studied, it's not clear that rapid antigen tests measure anything meaningful at all. As Dr. Pettengill notes,

> there are no data linking the CT value or viral quantity to transmissibility, and it is possible that viral culture may be an insensitive indicator of the potential of an infected person to transmit SARS-CoV-2.
>
> Furthermore, there is no clear separation between samples that are infectious or not for viral culture using the CT value, as there is significant overlap in the CT values of samples that are positive and negative in viral culture. Certainly people who have high levels of SARS-CoV-2 in their respiratory secretions are more likely to be infectious than those with low levels of virus, but that does not mean that rapid antigen based SARS-CoV-2 / COVID-19 tests can reliably detect whether someone is likely to be infectious.

(*Id.* at ¶¶ 23–24 (discussing recent studies).)

75.     A recent study "demonstrated further that specimens with low levels of virus—below the limit of detection of rapid antigen based tests—can still contain replicative virus (culture positivity), indicating that rapid antigen based tests are *not necessarily a good test of infectiousness,* with the potential for *meaningful numbers false negative results*." (*Id.* at ¶ 25 (emphasis added; citations omitted).)

21

76.     As Dr. Pettengill concludes, "[u]ntil those considering widely used rapid antigen based SARS-CoV-2 / COVID-19 testing strategies to demonstrate utility in a non-confounded real-world trial *there is insufficient evidence to know that this will be an effective public health and safety measure*, due to the potential for a low number of false negative results in infectious cases and high percentage of positive results being falsely positive at low disease prevalence." (*Id.* at ¶ 26  (emphasis added).)

**E.      Because the "Asymptomatic Spread Theory" Among or By Children Lacks Scientific Merit, Widespread Testing of Children is Counterproductive.**

77.     As Kevin McKernan, an expert in the field of testing, has noted, "[t]here is no science to suggest that testing asymptomatic children has any benefit to society," but "there is significant evidence that such testing: 'clogs the system,' making it less likely that symptomatic carriers are detected and isolated; burdens the schools and children, taking time away from curricular activities; harms children psychologically by depriving them of the comfort and security of their parents and family physicians during such testing; and has no empirical support for the claim that it is protective of the whole school body." (Declaration of Kevin McKernan ("McKernan Decl."), at ¶ 28, filed contemporaneously herewith.)

**F.      Order 2021-7's Test to Stay Policy Employs Scientifically Unsound Outbreak Triggers and Mandates Testing of All Students, Contrary to CDC Guidance.**

**i.      The CDC Guidance, Which Test to Stay Purports to Rely Upon, Suggests that "Outbreak Triggers" should be based on Community Spread, not specific cases at a particular school.**

78.     While the School Manual purports to cite to CDC guidance, the Test to Stay policy does not follow that CDC guidance in several crucial ways.

79.    For example, under the CDC's guidance, all decisions about whether to adopt mitigation measures in schools depend on "thresholds of community transmission," not on transmission within a particular school. (Centers for Disease Control and Prevention, *Transitioning from CDC's Indicators for Dynamic School Decision-Making (released September 15, 2020) to CDC's Operational Strategy for K-12 Schools through Phased Mitigation (released February 12, 2021) to Reduce COVID-19*, updated Feb. 18, 2021.)

80.    Those thresholds of community transmission are "total new cases per 100,000 persons in the past 7 days" and "percentage of [PCR tests] that are positive during the past 7 days." (*Id.*)

81.    Importantly, the CDC recommends that schools and school districts make decisions about "mitigation strategies, learning modes, and testing . . . based on their level of community transmission"—based on these two measures of community disease spread. (*Id.*)

82.    Nothing in the CDC's guidance suggests that schools or school districts should be making decisions about mitigation strategies based on perceived spread within particular schools or school districts. Since school-age children are not the source or cause of spread—as noted above—the focus for decisions regarding whether to implement mitigation measures must focus on broader community measurements of disease spread.

83.    As the CDC states, "screening testing should be offered [based on] levels of community transmission." (Centers for Disease Control and Prevention, *Operational Strategy for K-12 Schools through Phased Mitigation*, updated Feb. 26, 2021.)

84.    Contrary to Order 2021-7's Test to Stay policy, which requires students to be tested but allows teachers and staff to opt out, the CDC guidance explicitly states that "[w]hen

23

determining which individuals should be selected for screening testing, schools and public health

officials may consider prioritizing teachers and staff over students given the higher risk of severe

disease outcomes among adults." (*Id.*)

> ii.    **Because Defendants Are Using the Wrong Outbreak Trigger, the In-herent Flaws of PCR Testing Are Compounding the Arbitrariness of Defendant's Test to Stay Policy.**

85.    The adverse effects of Defendants' use of a scientifically erroneous outbreak trig-

ger—purported school cases instead of community spread—are felt particularly at smaller schools

under Test to Stay, since the outbreak threshold is set at a specific number (i.e., 15 positive cases).

Since a significant number of supposedly positive cases are actually false positives—or, at least

do not represent infectious cases—relying on that information to determine whether local school

boards may use Test to Stay is arbitrary and capricious. In other words, the entire trigger for Test

to Stay is inherently unreliable and based on dubious, unproven science.

86.    Kevin McKernan recently co-authored a paper, along with 22 international authors

who are among the world's leading experts in RT-PCR testing and pathology, demanding the re-

traction of a report by authors Corman and Drosten ("the Corman-Drosten paper") that has become

the basis for RT-PCR testing for SARS-CoV-2 in many places.

87.    On information, Plaintiffs believe that Defendants are utilizing the conclusions of

the Corman-Drosten paper to determine the number of positive cases for the outbreak triggers

under Order 2021-7's Test to Stay policy through their PCR testing processes.

88.    As Mr. McKernan has explained, "[a]ll Global PCR testing since the publication of

the Corman-Drosten paper in February 2020 has been based on theoretical sequences of SARS-

CoV-2 because the actual isolated genomic RNA was unavailable to the authors in February."
(McKernan Decl. at ¶ 8.)

89.     Mr. McKernan's co-authored paper pointed to "several major concerns with the
seminal Corman-Drosten paper regarding the global standard PCR protocol for diagnosis of
SARS-CoV- 2, including (i) erroneous primer concentrations, (ii) unspecified primer and probe
sequences,  (iii) the test cannot discriminate between the whole virus and viral fragments, (iv) the
test cannot be used as a diagnostic for SARS-viruses, (v) PCR data evaluated as positive after a
CT value of 35 cycles are completely unreliable, (vi) scientific studies show that only non-infec-
tious (dead) viruses are detected with CT values of 35, (vii) the PCR products have not been vali-
dated at the molecular level with DNA sequencing, a 'striking error of the protocol,' making the
test 'useless' as a specific diagnostic tool to identify the SARS-CoV-2 virus, and (viii) acknowl-
edgement by the Corman-Drosten paper that it 'generates false positives.'" (*Id.* at ¶ 9.)

90.     As Mr. McKernan has noted, "[t]he authors of the Corman-Drosten paper were also
on the editorial board, constituting a clear conflict of interest," the "paper was rushed through peer-
reviewed in 24 hours" even though the "average review time for [the journal that published the
article] is 179 days." (*Id.* at ¶ 11.)

91.     As Mr. McKernan observes, a recent study concludes that "'current PCR testing is
therefore not the appropriate gold standard for evaluating a SARS-CoV-2 public health test'" be-
cause, for example, "qPCR tests can still be positive 77 days after infectiousness has past," result-
ing in "***5-10 [times]*** more people being quarantined than necessary." (*Id.* at ¶ 14 (emphasis added).)

92.     This type of testing is hopelessly overinclusive because it can detect only "the pres-
ence of viral RNA," not "for viral infectiousness or illness," which requires "[f]urther testing . . . to

see if [a person is] truly positive for SARS-CoV-2 infection and the patient is in fact infectious." (*Id.* at ¶ 15.)

93.     Indeed, since the tests can detect past infection for up to 77 days after infectiousness but "[t]he infectious period of this virus is only 7–10 days," the "the majority of positive students will be falsely identified as infectious by this test," especially since "[b]oth asymptomatic and symptomatic spread of the school age group is rare as most don't develop symptoms." (*Id.* at ¶ 16.)

94.     Moreover, the CDC even acknowledges that the more sensitive "RT-PCR can detect levels of viral nucleic acid that cannot be cultured, suggesting that the presence of viral nucleic acid does not always indicate contagiousness." (Centers for Disease Control and Prevention*, Interim Guidance for Antigen Testing for SARS-CoV-2*, Updated Dec. 16, 2020.)

95.     And remember, the testing that Defendants require of the students here is, according to the CDC, "less sensitive than real-time reverse transcription polymerase chain reaction (RT-PCR) and other nucleic acid amplification tests ("NAATs") for detecting the presence of viral nucleic acid." (*Id.*

96.     In other words, Test to Stay begins with suspect data and then piles on even more useless data through coerced use of experimental "testing" that generates massive numbers of false positives.

> **iii.     And even when testing may be appropriate, the CDC says it should be voluntary—which is more than adequate for the purposes of screening testing according to the CDC.**

97.     Unlike Test to Stay, the CDC's guidance for use of widespread rapid antigen testing never suggests that such testing should be mandated.

98.     The CDC's guidance on screening testing in school is unequivocal—"[t]esting should be offered on a voluntary basis." (Centers for Disease Control and Prevention, *Operational Strategy for K-12 Schools through Phased Mitigation*, updated Feb. 26, 2021.)

99.     As Mr. McKernan notes, "'consent' is not properly considered 'consent' to the extent that refusal to submit to testing results in eviction from any in-person schooling until 'consent' is given." (McKernan Decl. at ¶ 24.)

100.    The CDC's guidance says that public health officials may "advise" certain groups to be tested, and urges the public to "follow this advice," but never does the CDC suggest that such testing should be mandated—including to receive an essential public benefit such as education. (Centers for Disease Control and Prevention, *Overview of Testing for SARS-CoV-2 (COVID-19)*, updated Oct. 21, 2020.)

101.    The CDC guidance stresses that when community spread is significant, public health authorities may, "request significant numbers of asymptomatic 'healthy people' to be tested," but never suggests that such testing be mandated or coerced. (Centers for Disease Control and Prevention, *Id.*

102.    Critically important is the CDC's recognition that it is entirely unnecessary to force students to be tested to accomplish the goals of screening testing, like that of Test to Stay.

103.    As the CDC concludes in its definitive guidance on the implementation of screening testing policies that "[s]chools may consider testing a random sample of at least 10% of students . . . for screening testing in areas of moderate and substantial community transmission." (Centers for Disease Control and Prevention, *Operational Strategy for K-12 Schools through Phased Mitigation*, updated Feb. 26, 2021.) The CDC's guidance provides an "example" of

27

"randomly select[ing] 20% of the students each week for testing out of the entire population of students attending in-person instruction" for testing. (*Id.*) In other words, it entirely unnecessary to test all of the students at school to achieve the desired results.

### G. Defendants' "Consent" Forms Fail to Provide Ethically Complete Disclosures or Obtain True Consent.

104.    Because of the inherent flaws of existing COVID-19 testing, as outlined above, all such testing is inherently experimental at this time.

105.    As Mr. Kevin McKernan has noted, "free and informed consent to any medical procedure (not just experiments) [is] the hallmark of ethical medicine." (McKernan Decl. at ¶ 17.)

106.    Mr. McKernan has pointed to a recent article in the journal Nature concluding that "minors should be able to decide personally regarding a genetic test when they are well informed, have an adequate understanding of the test and its potential consequences, have the capacity to make this decision, are not exposed to external pressure and have had appropriate counselling." (*Id.* (citing article).)

107.    Here under Test to Stay, parents and their children are not provided with the information about the inherent limitations of the proposed testing to properly exercise informed consent.

## III.    THE PARTIES

108.    Plaintiffs are parents of two children that are enrolled in Utah public schools.

109.    Plaintiffs' child M.M. is a student at PCHS. M.M. was isolated for refusing to consent to the continuing COVID-19 testing as required by the Park City School District. After M.M.'s isolation, M.M. was forced to participate in distance learning despite not consenting to distance learning. M.M. has recently been allowed to return the school without consenting to continuing

COVID-19 testing, but Plaintiffs are fearful that should fifteen (15) students and school staff test positive, or if there is a community outbreak, M.M. will once again be subjected to either, isolation, consenting to continuing COVID-19 testing, or distance learning.

110.    Plaintiffs' child T.M. is a student at TMJH. T.M. was isolated for refusing to consent to the continuing COVID-19 testing as required by the Park City School District. After T.M.'s isolation, T.M. was forced to participate in distance learning despite not consenting to distance learning. T.M. has recently been allowed to return the school without consenting to the continuing COVID-19 testing, but Plaintiffs are fearful that should fifteen (15) students or school staff test positive, or if there is a community outbreak, T.M. will once again be subjected to either, isolation, consenting to continuing COVID-19 testing, or distance learning.

111.    Defendant Richard Saunders is being sued in his Official Capacity as Executive Director of Utah Department of Health.

112.    Summit County Health Department is a county government agency tasked with enforcement of Summit County's health directives.

113.    Richard Bullough is being sued in his Official Capacity as Director of Summit County Health Department.

114.    Summit County Board of Health is a county government agency tasked with determining Summit County health directives.

115.    Chris Cherniak is being sued in his Official Capacity as Chair of Summit County Board of Health.

116.    Dr. Sydnee Dickson is being sued in her Official Capacity as State Superintendent of Public Instruction of the Utah State Board of Education.

4817-5021-7951.v2

117.    Park City School District is a school district in Summit County, Utah, tasked with the management and implantation of school directives for all Park City School District students.

118.    Dr. Jill Gildea is being sued in her Official Capacity as Superintendent of Park City School District,

119.    Anne Peters is being sued in her Official Capacity as a member of Park City School District's School Board.

120.    Andrew Caplan is being sued in his Official Capacity as a member of Park City School District's School Board.

121.    Wendy Crossland is being sued in her Official Capacity as a member of Park City School District's School Board.

122.    Kara Hendrickson is being sued in her Official Capacity as a member of Park City School District's School Board.

123.    Erin Grady is being sued in her Official Capacity as a member of Park City School District's School Board.

## IV.    JURISDICTION AND VENUE

124.    This action arises under 42 U.S.C. § 1983 because of Defendants' deprivation of Plaintiffs' constitutional rights to due process and equal protection rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

125.    This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343 and has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief and damages under 28 U.S.C. § 1343(a) and 42 U.S.C. § 1983; and attorneys' fees and costs under 42 U.S.C. § 1988.

4817-5021-7951.v2

126.    The Court has jurisdiction over Plaintiffs' supplemental state court claims under 28 U.S.C. § 1367.

127.    Venue is proper in District of Utah under 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 Violation of Due Process under the Fourteenth Amendment
### Deprivation of Substantive Due Process
### (By All Plaintiffs Against All Defendants)

128.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

129.    The Due Process Clause protects those fundamental rights and liberties which are deeply rooted in this Nation's history and tradition. *Washington v. Glucksberg*, 521 U.S. 702, 703 (1997). The Due Process Clause contains a substantive component that "bars arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

130.    The Fourteenth Amendment "forbids the government to infringe fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington*, 521 U.S. at 721.

131.    Under the Due Process Clauses of the Fifth and Fourteenth Amendments, "no person may be deprived of life, liberty, or property without reasonable notice and an opportunity to be heard." U.S. Const. amend. V; XIV.

132.    Plaintiffs have the fundamental right to direct their children's upbringing, education, and care. *Troxel v. Granville*, 530 U.S. 57 (2000).

4817-5021-7951.v2

133.    No state shall infringe these rights without demonstrating that its governmental interest as applied to the person is of the highest order and not otherwise served. *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972).

134.    Defendants have deprived Plaintiffs of the right to direct their children's education in violation of the Fourteenth Amendment by implementing the mandatory Test to Stay program and precluding children from receiving an in-person education who object to the mandated testing.

135.    Defendants lack any compelling interest, much less a rational basis, to burden the right to an in-person education. Although COVID-19 presents a significant health challenge within communities, there is no scientific basis for concluding that Defendants' mandatory Test to Stay policy will have any effect on the spread of COVID-19 in the community or in any school. On the contrary, prevailing scientific guidance suggests exactly the opposite.

136.    The quality of virtual or remote education instruction is inferior to in-person instruction, as Defendants have repeatedly acknowledged.

137.    Plaintiffs have no adequate remedy at law. They will continue to suffer irreparable harm unless Defendants are enjoined from continuing to implement or enforce any policy that mandates the testing of non-symptomatic students as a condition of access to in-person public education.

138.    Pursuant to 42 U.S.C. § 1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants' mandatory Test to Stay.

4817-5021-7951.v2

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 Violation of Due Process under the Fourteenth Amendment**
**Deprivation of Procedural Due Process**
**(By All Plaintiffs Against All Defendants)**

139.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

140.    Defendants have failed to provide families with an appeal process from positive COVID-19 tests that require isolation, quarantine, and disruption of children's lives and education.

141.    In light of the scientific evidence regarding the high rate of false positives—particularly when the rate of community spread is low—a number of children will be falsely labeled with the "Scarlet C"—COVID-19 positive.

142.    Defendants have failed to provide a process to contest the denial of medical exemptions, directly affecting Plaintiffs and their children.

143.    Plaintiffs and their children have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from requiring mandatory Test to Stay.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 Violation of the Equal Protection Clause**
**under the Fourteenth Amendment**
**(By All Plaintiffs Against All Defendants)**

144.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

145.    The equal protection doctrine prohibits governmental classifications that affect some groups of citizens differently than others. *Engquist v. Or. Dept. of Agric.*, 553 U.S. 591, 601 (2008).

4817-5021-7951.v2

146.   The Equal Protection Clause aims to abolish barriers presenting unreasonable obstacles to advancement based on individual merit.

147.   There is no rational basis to require mandatory testing, and thus, denial of in-person instruction to isolated groups of children whose parents object to invasive, experimental testing is a violation of the Equal Protection Clause.

148.   Plaintiffs and their children have been denied in-person instruction on the basis that they object to invasive, experimental testing as a condition for in-person instruction.

149.   Plaintiffs and their children have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from requiring mandatory widespread Test to Stay.

**FOURTH CLAIM FOR RELIEF**
**Violation of Parents' Fundamental Right to Direct Education**
**and**
**Violation of Utah Code Section 62A-4a-201**
**Parents' Fundamental Right to Supervise and Control Their Children**
**(By All Plaintiffs Against All Defendants)**

150.   Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

151.   Parents have the right to direct their children's upbringing, education, and care. *Troxel*, 530 U.S. at 58.

152.   The COVID-19 testing offered at the schools is highly inaccurate, resulting in a majority of false positives.

153.   Defendants have no adequate basis to require students to be subjected to mandatory testing with such low accuracy and the high probability of being falsely branded as infectious with a socially undesirable disease.

34

154.     If there is any basis for required testing of children without symptoms, it should be outside the school setting, supervised by parents and administered by healthcare providers of the parents' choosing. Parents can then provide certification of vaccination compliance and overall health, just as any other vaccination requirement. (*See* Utah Code § 53G-9-302).

155.     If Test to Stay continues to be a requirement, parents must be able to obtain equivalent certification from a medical provider of their choosing, just as with any other immunization certificate.

156.     If Test to Stay continues to be a requirement, Defendants should also provide an exemption form for parents and/or legally responsibly individuals to decline to obtain a vaccination or test. (*See* Utah Code § 53G-9-304).

157.     Plaintiffs have no adequate remedy at law. They will continue to suffer irreparable harm unless Defendants are enjoined from continuing to implement or enforce any policy that mandates the testing of non-symptomatic students as a condition of access to in-person public education.

**FIFTH CLAIM FOR RELIEF**
**Violation of Right to Privacy under the Fourth Amendment**
**(By All Plaintiffs Against All Defendants)**

158.     Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

159.     Plaintiffs assert the Privacy Clause of the Fourth Amendment that respects each person's fundamental right to a zone of privacy for medical decision making.

4817-5021-7951.v2

160.     Plaintiffs and their children constantly have to worry about false-positives resulting from low-accuracy COVID-19 tests that may result in isolation, quarantine, and ineffective remote learning.

161.     Test to Stay infringes on zone of privacy to make personal medical decisions and coerces parents to reveal highly personal information regarding their child to multiple agencies and organizations which is an unreasonable invasion of personal medical privacy.

162.     Plaintiffs have no adequate remedy at law. They will continue to suffer irreparable harm unless Defendants are enjoined from continuing to implement or enforce any policy that mandates the testing of non-symptomatic students as a condition of access to in-person public education.

**SIXTH CLAIM FOR RELIEF**
**Violation of Utah Constitution, Art. X, § 1**
**Provide for the Maintenance and Support of thorough and**
**efficient system of free public schools**
**(By All Plaintiffs Against All Defendants)**

163.     Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

164.     The Utah Constitution provides that the

> Legislature shall provide for the establishment and maintenance of the state's education systems including: (a) a public education system, which shall be open to all children of the state; and (b) a higher education system.

Utah Const., art. X, § 1.

165.     Virtual or remote learning does not meet the obligation to provide children with the right to a minimal education, as Defendants have effectively admitted, and therefore, Defendants

36

have failed to provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all children.

166.    Remote learning does not meet Defendants' obligation to provide Utah children with a right to minimal education.

167.    The Utah Constitution guarantees an adequate, equal public education to all children—not only those who first "consent" to experimental testing.

168.    Plaintiffs have no adequate remedy at law. They will continue to suffer irreparable harm unless Defendants are enjoined from continuing to implement or enforce any policy that mandates the testing of non-symptomatic students as a condition of access to in-person public education.

### SEVENTH CLAIM FOR RELIEF
### Violation of Utah Code Section 26-6b-1 et seq.
### Provide for the Treatment, Isolation, and Quarantine Procedures
### (By All Plaintiffs Against All Defendants)

169.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

170.    The Utah Code for Communicable Diseases limits who can isolate and quarantine an individual, establishes how that process is conducted, and identifies who is "subject to restriction."

171.    Defendants have taken it upon themselves to arbitrarily decide who is subject to restriction within their district—including students who refuse to take an experimental test but arrive at school for in-person instruction.

172.    Defendants' isolation of Plaintiffs' children previously was in violation of this statute and any future isolation of Plaintiffs' children will constitute further violations.

4817-5021-7951.v2

173.     Accordingly, Defendants' actions threaten further violations of Utah law.

174.     Plaintiffs have no adequate remedy at law. They will continue to suffer irreparable harm unless Defendants are enjoined from continuing to implement or enforce any policy that mandates the testing of non-symptomatic students and isolates any student who refuses but arrives to school.

DATED March 10, 2021.

/s/ *Brandon J. Mark*

Brandon J. Mark
Gregory H. Gunn
PARSONS BEHLE & LATIMER

Attorneys for Plaintiffs

4817-5021-7951.v2