Brandon J. Mark, USB #10439
Gregory H. Gunn, USB #15610
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
Email: BMark@parsonsbehle.com
        GGunn@parsonsbehle.com
        ecf@parsonsbehle.com

*Attorneys for Plaintiffs*

---

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| HOLLY McCLURE, Individually and as a Parent and Natural Guardian of T.M and M.M., MARK McCLURE, Individually and as a Parent and Natural Guardian of T.M and M.M., | **MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT** |
| Plaintiffs, | Case No. 2:21-cv-00148-CMR |
| vs. | Magistrate Judge Cecilia M. Romero |
| RICHARD SAUNDERS, in his Official Capacity as Executive Director of Utah Department of Health; SUMMIT COUNTY BOARD OF HEALTH; RICHARD BULLOUGH, in his Official Capacity as Health Director of Summit County Health Department; CHRIS CHERNIAK, in his Official Capacity as Chair of Summit County Health Department; DR. SYDNEE DICKSON, in her Official Capacity as State Superintendent of Public Education; PARK CITY SCHOOL DISTRICT; DR. JILL GILDEA, in her Official Capacity as Superintendent of Park City School District; PARK CITY SCHOOL DISTRICT BOARD; and ANNE PETERS, ANDREW CAPLAN, WENDY CROSSLAND, KARA HENDRICKSON and ERIN GRADY, in their Official Capacities as members of Park City School District Board, | |
| Defendants. | |

/ /

/ /

/ /

/ /

PBL\4821-3242-5183.v7-3/10/21

Plaintiffs Mark McClure and Holly McClure, and for their minor children, hereby respectfully submit this Motion for Preliminary Injunction and Memorandum in Support ("Motion").

## STATEMENT OF THE RELIEF REQUESTED

Plaintiffs Mark and Holly McClure are parents of children whose schools have shut them out for refusing to undergo experimental testing with known flaws. While acknowledging the challenges of the COVID-19 pandemic, Plaintiffs seek to vindicate their constitutional rights to be free from unwarranted and unjustified government intrusion into their fundamental liberties.

In particular, the McClures seek a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, to restore their children's ability to return to full-time in-school instruction free from coerced experimental medical testing under Defendants' mandatory Test to Stay policy.

Plaintiffs ask the Court to enjoin defendants from continuing to violate their (and their children's) Constitutional rights under the Fourth, Fifth, and Fourteenth Amendments, including fundamental rights to bodily integrity, informed consent, education and parenting. Plaintiffs and their children are unquestionably suffering irreparable harm from these deprivations; Plaintiffs are likely to succeed on the merits and will show that the balance of equities tips sharply in their favor.

## STATEMENT OF RELEVANT FACTS

Plaintiffs expect to present evidence at the hearing that will establish the following:

### A. Defendants' Implement Mandatory Test to Stay through Utah Department of Health Order 2021-7.

1.     UDOH 2021-7 ("Order 2021-7"), entered February 24, 2021, replaced the previous health orders, and delegates authority to local education agencies ("LEA"), such as Defendant Park City School District ("PCSD"), to decide in consultation with "local health department[s]" whether to implement Test to Stay once the *school-based* "outbreak threshold" has been satisfied. (Order

3

2021-7, §10.) But Order 2021-7 provides **no criteria, guidelines, or other guardrails** to LEAs regarding their decision whether, or how, to implement Test to Stay. (Attached as Exhibit A.)

2. Once an LEA implements Test to Stay based on whatever factors it chooses, Order 2021-7 provides that the LEA "shall require a student to participate in virtual or remote learning if the student does not or is unable to participate in testing of any kind" and either less than 60% of students participate in the testing or the "resulting percent positivity from those who participated in the testing event is equal to or greater than 2.5%." (*Id.*) This is the case even if the student has had no symptoms or contact with anyone who has tested positive.

3. Even though students must be excluded from school if they decline experimental rapid antigen testing, teachers and school staff members may opt out of testing but may (indeed must) nevertheless continue to perform their job duties *in person* at the school. (*Id.*)

4. Incredibly, despite the fact that the majority of "positive" results from this kind of imprecise testing will be false, as detailed below, students who do test "positive" under this mandatory testing must isolate at home, even if they had no symptoms before the test. (Utah Department of Health, *COVID-19 School Manual* ("School Manual") at 52, updated Mar. 1, 2021, attached as Exhibit B.) Students who do not have COVID-19 and who are not infectious are nevertheless branded with the "Scarlet C" by their families, schools, peers, and others—excluded from participating in not only school, but almost everything else.

  **B. Defendants Implemented Mandatory Test to Stay Policies at Plaintiffs' Children's Schools, Depriving Plaintiffs' Children of In-Person Instruction. Defendants Threaten to Do So Again in the Future Unless Enjoined.**

5. Plaintiffs Mark and Holly McClure are the parents of two children, T.M. and M.M. T.M. is enrolled in Treasure Mountain Junior High ("TMJH"), and M.M. is enrolled in Park City

High School ("PCHS"). (Holly McClure Declaration ("McClure Decl."), ¶ 2, filed contemporaneously herewith.)

6. On January 12, 2021, the McClures were notified by TMJH, PCHS, and PCSD that the TMJH and PCHS had exceeded the state-defined threshold of fifteen positive cases of COVID-19 at each campus, and therefore would be going to remote learning for a period of ten days, and, upon return from remote learning, would be implementing the state's "Test to Stay" program for families who wanted their children to continue with in-person learning. (*Id.* ¶ 5.)

7. The McClures were notified that under the Test to Stay program, all students at TMJH and PCHS who wanted to attend in person would have to be tested every fourteen days. They were also told that the program would only be implemented at these two schools in PCSD. (*Id.* ¶ 6.)

8. Between January 20, 2021 and January 23, 2021, through a series of letters and emails, Mrs. McClure informed Dr. Jill Gildea, PCSD Superintendent, Mr. Roger Arbabi, principal of PCHS, and Mr. Caleb Fine, principal of TMJH, that the McClures strongly objected to the compelled testing of their children, that they did not consent to have T.M. and M.M. tested for COVID-19 at the school under the Test to Stay program, but they also did not consent to transition to remote learning for their children. (*Id.* ¶ 8.)

9. On January 25, 2021, both T.M. and M.M. returned to school with all other students whose families chose in-person learning. Most of the students returning on that day had not yet been tested, as testing would occur over the next fourteen days. (*Id.* ¶ 9.)

10. T.M. and M.M. were both scheduled for COVID-19 tests on January 25, 2021, but both missed their appointments. M.M. received official notice of a second testing date of February

8, 2021. (*Id.* ¶ 10.)

11.     On February 3, 2021, Mrs. McClure received a phone call from Mr. Fine, notifying her that T.M. had been removed from class and isolated on campus because of the missed COVID-19 test and Plaintiffs' refusal to consent to the continuing COVID-19 testing of T.M. Mr. Fine further notified Plaintiffs that T.M. would be placed in isolation every day that T.M. came to school without consenting to the continuing COVID-19 testing. (*Id.* ¶ 11.)

12.     During T.M.'s isolation, T.M. was placed in a room with a teacher, was informed that she would not be allowed to visit the restroom while other students were present in the hallways, and would not be allowed to eat lunch with any students. A computer was set up for T.M., and she was directed to start school through remote learning, even though the McClures had not consented to remote learning. (*Id.* ¶ 12.)

13.     On February 8, 2021, M.M. missed her second COVID-19 test. M.M. was then removed from her class and placed at a desk in a hallway inside the administrative wing of the school. Mr. Arbabi contacted Mrs. McClure and informed her of M.M.'s isolation because of the McClures' refusal to consent to continued COVID-19 testing. When Mrs. McClure arrived at the school to pick up M.M., Mr. Arbabi notified Mrs. McClure that Plaintiffs' options were either to consent to the continuing COVID-19 testing or consent to enrollment in distant learning. If the McClures continued to send M.M. to school without consenting to continuing COVID-19 testing, Mr. Arbabi would continue to isolate M.M. (*Id.* ¶ 13.)

14.     Every school day after the isolation of M.M. and T.M., Plaintiffs sent an email to TMJH and PCHS objecting to continued remote learning. (*Id.* ¶ 14.)

15.     On February 25, 2021, Mrs. McClure received a call from both Mr. Fine and Mr.

Arbabi informing her that T.M. and M.M. can return to in-person learning due to a change in the Test to Stay program allowing in-person learning if 60% of the student body is participating in the Test to Stay program. (*Id.* ¶ 15.)

### C. According to Defendants' Own Scientific Sources, COVID-19 Poses a Low Risk to Children.

16. "COVID-19 is a new disease, caused by a novel coronavirus that has not previously been seen in humans." *See* Centers for Disease Control and Prevention, *Frequently Asked Questions* (Mar. 1, 2021), https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Basics.

17. According to the U.S. Centers for Disease Control and Prevention ("CDC"), upon which Defendants' policies purport to rely, "[a]lthough children can be infected with SARS-CoV-2, . . . less than 10% of COVID-19 cases in the United States have been among children and adolescents aged 5–17 years." (Centers for Disease Control and Prevention, *Transmission of SARS-CoV-2 in K-12 schools*, updated Feb. 12, 2021.) The CDC says that "[c]ompared with adults, children and adolescents who have COVID-19 are more commonly asymptomatic (never develop symptoms) or have mild, non-specific symptoms," that "[c]hildren are less likely to develop severe illness or die from COVID-19," and that "rates of severe outcomes from COVID-19 including mortality and hospitalization in school-aged children are low." (*Id.*)

18. Importantly, the CDC has found that "[b]ased on the data available, in-person learning in schools has not been associated with substantial community transmission" of COVID-19. (*Id.*) Furthermore, in-person schooling is not causing further community spread—in other words, in-person learning is not causing COVID-19 problems in the wider community. As the CDC notes, "[i]ncreases in case incidence among school-aged children and school reopenings do not appear to pre-date increases in community transmission." (*Id.*) According to the CDC, "[t]he evidence to

7

date suggests that staff-to-student and student-to-student transmission are not the primary means of exposure to SARS-CoV-2 among infected children" and "[s]everal studies have also concluded that students are not the primary sources of exposure to SARS-CoV-2 among adults in school settings." (*Id*.)

19. Moreover, Defendants' Test to Stay policy ignores the best available science—requiring children to be tested to receive a basic, in-person education but giving all of the adults at those same schools, including teachers, staff, and even the administrators, a "free pass" to reject testing but still attend all school functions in person. This notwithstanding the CDC's clear findings that "[w]hen outbreaks occur in school settings, they tend to result in increased transmission among teachers and school staff rather than among students." (*Id*.) Indeed, the CDC says that "[e]vidence suggests that staff-to-staff transmission is more common than transmission from students to staff, staff to student, or student to student." (*Id*.) The CDC concludes that, "[t]herefore, school interventions should include measures to reduce transmission among staff members." (*Id*.) Yet Order 2021-7's Test to Stay completely exempts teachers and staff—those most likely to contract, spread, and become ill—from the mandated testing. This is entirely backwards.

### D. Remote Learning Poses Potential Irreparable Harm to Children, as Defendants Have Acknowledged.

20. According to the Department of Health's own School Manual, in-person schooling is far superior for everyone—students, teachers, and the wider community. The first substantive page of the School Manual declares as its first statement that it is "**important to open schools for in-person instruction**." (School Manual, Exh. B at 4 (emphasis in original).) Indeed, as study after study has shown, "[s]chools provide critical psychological, mental, and behavioral health services to children who may not have access to these services outside of school (such as

8

psychological counseling, and other mental health and behavioral assessments)." (*Id.*)

21. As the Department agrees, "[i]n-person instruction allows teachers and students to communicate better" and "provides students with critical academic services which are not always available or accessible if students are not in school," including "school-based tutoring, special education, and other specialized learning supports." (*Id.*) The Department's own School Manual acknowledges that "[s]ocial interaction for children in grades K-12 is important not only for emotional wellbeing, but also for children's language, communication, social, and interpersonal skills," and "[w]hen children are out of school, they may be separated from their social network and peer-to-peer social support." (*Id.* at 5.) In short, as the Department concedes, remote education puts students "***at greater risk for poor health and educational outcome[s]***." (*Id.* (emphasis added).)[1]

### E. The COVID-19 Tests Employed by the School Districts are Faulty and Inaccurate.

22. Defendants require students to undergo frequent, universal testing SARS-CoV-2, including with quarantine of those with a positive result, under Test to Stay. But as Dr. Matthew Pettengill will explain, such tests have not been adequately validated and that "[h]igh-quality outcome data demonstrating the efficacy of this testing strategy are needed before widespread implementation." (Declaration of Dr. Matthew Pettengill ("Pettengill Decl."), filed contemporaneously herewith.) According to Dr. Pettengill,

> [a]vailable studies have found that most SARS-CoV-2 antigen tests to have relatively high specificities, generally in the range of 99 to 99.9%, meaning that 0.1% to 1.0% of all tests on patients who do not have COVID-19 will test falsely positive. When prevalence is

---

[1] As the World Health Organization has noted, "[t]he longer a student stays out of school, the higher risk of dropping out." *See* World Health Organization, Checklist to support schools reopening and preparations for COVID-19 resurgences or similar public health crises (Dec. 11, 2020), at 4.

> low, however, this can still lead to a high percentage of positive test results that are falsely positive, meaning the test will have a low positive predictive value or low confidence in positive results.

(Pettengill Decl. ¶ 16 (discussing recent studies).) As Dr. Pettengill has observed, "[a]ccording to data acquired from Johns Hopkins University" for Summit County, Utah, and based on new "infections per day for the period from February 19 through March 4, 2021," "the prevalence of documented active and likely transmissible SARS-CoV-2 of approximately 70 individuals per day" in Summit County. (*Id.* ¶ 17.) That "indicates that it is highly unlikely that true prevalence exceeds 0.5% of the county population," and, if true, and the "specificity of the test utilized is 99%" (as recent research indicates for asymptomatic children, then "***the majority of positive results in this population will be falsely positive***." (*Id.* (citing recent studies) (emphasis added).)[2]

23.     Defendants concede this, noting that "[r]apid antigen tests can detect only high amounts of virus and are less sensitive than PCR tests" and that "[w]hen antigen testing is used to test people who don't have symptoms (called asymptomatic) there is a higher chance of having a false positive result." *See* Utah Dep't of Health, Covid-19 Rapid Antigen Testing (Oct. 27, 2020), at 1, https://coronavirus-download.utah.gov/Health/COVID-19_Rapid_Antigen_Test.pdf.

24.     As Dr. Pettengill concludes, "[u]ntil those considering widely used rapid antigen based SARS-CoV-2/COVID-19 testing strategies to demonstrate utility in a non-confounded real-world trial *there is insufficient evidence to know that this will be an effective public health and*

---

[2] The results of an antigen must be "interpreted" to determine whether a positive result is clinically meaningful, which the CDC says should include an evaluation of "the length of time the patient has experienced symptoms," but Defendants' mandatory Test to Stay requires testing of every student, regardless of whether the student has experienced any symptoms whatsoever. According to the CDC's guidance, a positive antigen test without symptoms is virtually meaningless, but Defendants insist on them nevertheless. (Centers for Disease Control and Prevention, Interim Guidance for Antigen Testing for SARS-CoV-2, updated Dec. 16, 2020.)

*safety measure*, due to the potential for a low number of false negative results in infectious cases and high percentage of positive results being falsely positive at low disease prevalence." (Pettengill Decl. ¶ 17 (emphasis added).)

     **F.   Defendants' Test to Stay Policy Employs Scientifically Unsound Outbreak Triggers and Mandates Testing of All Students, Contrary to CDC Guidance.**

25.    While Defendants' School Manual purports to cite to CDC guidance, the Test to Stay policy does not follow that CDC guidance in several crucial ways. First, under the CDC's guidance, all decisions about whether to adopt mitigation measures in schools depend on "thresholds of community transmission," not on transmission within a particular school. (Centers for Disease Control and Prevention, *Transitioning from CDC's Indicators for Dynamic School Decision-Making (released September 15, 2020) to CDC's Operational Strategy for K-12 Schools through Phased Mitigation (released February 12, 2021) to Reduce COVID-19*, updated Feb. 18, 2021.) As the CDC states, "screening testing should be offered [based on] levels of community transmission." (Centers for Disease Control and Prevention, *Operational Strategy for K-12 Schools through Phased Mitigation*, updated Feb. 26, 2021 (hereinafter, "CDC *Operational Strategy*").)

26.    But Defendants' Test to Stay instead uses purported case counts at particular schools as the "outbreak threshold" for allowing schools to implement mandatory testing. ***Nothing in the CDC's guidance suggests that schools or school districts should be making decisions about mitigation strategies, including whether to implement screening testing, based on perceived spread within particular schools or school districts.***

27.    The adverse effects of Defendants' use of a scientifically erroneous outbreak trigger—purported school cases instead of community spread—are felt particularly at smaller schools

under Test to Stay, since the outbreak threshold is set at a specific number (i.e., 15 positive cases). Since a significant number of supposedly positive cases are actually false positives—or, at least do not represent infectious cases—relying on that information to determine whether local school boards may use Test to Stay is irrational and arbitrary and capricious.

28.     As Kevin McKernan will testify, the PCR/NAATs testing that Defendants are relying upon to determine the purported number of "positive" school cases, is scientifically flawed. Among his many problems with the current testing protocols—which are all based on early, now-outdated research—McKernan has noted since "qPCR tests can still be positive 77 days after infectiousness has past," they result in "*5-10 times* more people being quarantined than necessary." (Declaration Kevin McKernan ("McKernan Decl."), at ¶ 14, filed contemporaneously herewith (emphasis added).) Since the tests can detect past infection for up to 77 days after infectiousness but "[t]he infectious period of this virus is only 7–10 days," the "***the majority of positive students will be falsely identified as infectious by this test***," especially since "[b]oth asymptomatic and symptomatic spread of the school age group is rare as most don't develop symptoms." (*Id.* ¶ 16.)

29.     Second, and more significant, the CDC's guidance on screening testing in school is unequivocal—"***[t]esting should be offered on a voluntary basis***" only. (CDC, *Operational Strategy*.) The CDC guidance stresses that when community spread is significant, public health authorities may, "request significant numbers of asymptomatic 'healthy people' to be tested," but never suggests that such testing be mandated or coerced. (Centers for Disease Control and Prevention, *Overview of Testing for SARS-CoV-2 (COVID-19)*, updated Oct. 21, 2020.)

30.     Critically important is the CDC's recognition that it is entirely unnecessary to force students to be tested to accomplish the goals of screening testing, like that of Test to Stay. As the

CDC concludes in its definitive guidance on the implementation of screening testing policies that "[s]chools may consider testing a random sample of at least 10% of students . . . for screening testing in areas of moderate and substantial community transmission." (CDC, *Operational Strategy*.)

This motion, the accompanying memorandum, exhibits, and declarations filed concurrently herewith are incorporated by reference as though fully set forth herein. They demonstrate that not even a rational basis for Defendants' flawed scheme exists, and that Defendants have violated a myriad of fundamental rights.

## ARGUMENT

### I. PLAINTIFFS MEET THE PRELIMINARY INJUNCTION REQUIREMENTS.

To succeed on a motion for preliminary injunction, Plaintiffs must show that (1) they are "substantially likely to succeed on the merits"; (2) they will "suffer irreparable injury" if the court denies the injunction; (3) their "threatened injury" outweighs any injury the opposing party may suffer from the injunction; and (4) that the injunction is not "adverse to the public interest." *See Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019); *accord Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth preliminary injunction factors "merge" when the government is the party opposing the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citing *Winter*, 555 U.S. at 20, 24). Because Plaintiffs satisfy the four elements above, Plaintiffs respectfully ask that the Court grant the requested relief and issue a preliminary injunction.

PBL\4821-3242-5183.v7-3/10/21

## II.   PLAINTIFFS AND THEIR CHILDREN WILL SUFFER IRREPARABLE HARM.

The United States Court of Appeals for the Tenth Circuit has repeatedly found that irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018). Moreover, "when an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," suggesting that merely plausibly alleging a constitutional violation satisfies the irreparable harm factor per se. *See Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1263 (10th Cir. 2016); *accord* 11A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, § 2948.1 (2d ed. 1995).

"Irreparable harm" means only that "the injury 'must be both certain and great' . . . [and is] often suffered when 'the injury can [not] be adequately atoned for in money,' or when 'the district court cannot remedy [the injury] following a final determination on the merits.'" *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (citations omitted).

### A. Exclusion from School Constitutes Irreparable Harm.

Exclusion from school, standing alone, unquestionably constitutes irreparable harm. "[E]ducation is perhaps the most important function of state and local governments." *Brown v. Bd. of Ed. of Topeka*, 347 U.S. 483, 493 (1954). Denying children a basic education denies "them the ability to live within the structure of our civil institutions . . . ." *Plyer v. Doe*, 457 U.S. 202, 223 (1982). The Utah Constitution indeed mandates that "[t]he Legislature shall provide for the establishment and maintenance of the state's education systems including" a "public education system, which shall be ***open to all children*** of the state." Utah Const., art. X, § 1 (emphasis added). The Utah Supreme Court concluded over eighty years ago:

> The requirement that the schools must be open to all children of the state is a prohibition against any law or rule which would separate or divide the children of the state into classes or groups, and grant, allow, or provide one group or class educational privileges or advantages and denied another. No child of school age, resident within the state, can be lawfully denied admission to the schools of the state because of race, color, location, religion, politics, ***or any other bar or barrier*** which may be set up which would deny to such child equality of education opportunities or facilities with all other children of the state.

*Logan City Sch. Dist. v. Kowallis*, 77 P.2d 348, 350 (Utah 1938) (emphasis added).

According to the American Academy of Pediatrics, "children learn best when physically present in the classroom."[3] Defendants know this too. As noted above, Defendants concede that remote education puts students "at greater risk for poor health and educational outcome[s]." (School Manual, Exh. B at 5.) Hard evidence makes crystal clear that in-person education is not a luxury; it is a necessity. Courts must rightly assume irreparable harm from school exclusion.

### B. Involuntary Experimental Testing Constitutes Irreparable Harm.

Defendants compel intrusive medical interventions on children as young as five years old without parental supervision or true consent. They are doing this against the bright line guidance of the CDC, which calls such testing "unethical and illegal." (Centers for Disease Control and Prevention, *Interim Considerations for Testing for K-12 School Administrators and Public Health Officials*, (Dec. 4, 2020).) Despite this guidance, of which Defendants must be aware, they choose to coerce testing. They confront parents with a Hobson's choice: put your child in isolated, inferior

---

[3] Press Release, Pediatricians, Educators and Superintendents Urge a Safe Return to School This Fall (July 10, 2020), https://services.aap.org/en/news-room/news-releases/aap/2020/pediatricians-educators-and-superintendents-urge-a-safe-return-to-school-this-fall/.

remote learning or subject her to intrusive, unwanted medical procedures. Either way, Plaintiffs are forced to give up constitutional rights and suffer irreparable harm.

Plaintiffs have no adequate remedy at law unless Defendants are enjoined from unwarranted—and inferior—remote learning and medical testing.

## III.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS.

### A. *Jacobson v. Commonwealth of Massachusetts* **is not a Blank Check for any Executive Action.**

District courts, appellate courts, and the Supreme Court have all looked to *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), when deciding suits seeking injunctive relief against government action during the COVID-19 pandemic. *See, e.g.*, *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief); *High Plains Harvest Church v. Polis*, 835 Fed. App'x 372 (10th Cir. 2020); *On Fire Christian Ctr., Inc. v. Fischer*, 453 F. Supp. 3d 901, 912 (W.D. Ky. 2020) (explaining that although constitutional law does not "remain rigidly fixed in the time of a national emergency . . . even under *Jacobson*, constitutional rights still exist").

To be sure, the law permits greater intrusions into civil liberties in times of greater communal need. Nevertheless, even during a public health crisis, the court may not "distort the Constitution to approve all that the" State deems necessary. *Korematsu v. United States*, 323 U.S. 214, 244 (1944) (Jackson, J., dissenting), *abrogated by Trump v. Hawaii*, 138 S. Ct. 2392 (2018). Thus, where the State has enacted emergency public health measures, a court should not uphold policies which (i) have "no real or substantial relation" to the State's public health objectives; or (ii) are "a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31.

Where the State's policies go "far beyond what [is] reasonably required for the safety of the public," the court is "authorize[d] or compel[led] . . . to interfere . . . ." *Id*. at 28.

Although it is fair to say that courts have interpreted *Jacobson* liberally, the landmark case itself warned against actions precisely like Defendants', noting that an order "might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to" warrant an injunction. *Id.* Defendants' arbitrary and unreasonable acts here call out for courts to "interfere" for the protection of the very children Defendants' policy purports to protect.

Invasive medical testing of children by masked strangers without authentic parental consent is precisely the kind of government action that *Jacobson* held beyond the pale. Over one hundred years ago, the Supreme Court acknowledged that citizens must rightfully dispute government authority when it tramples domains that must remain with the "supremacy of his own will." *Id.* Surely testing inside one's body, or inside his child's body, constitutes such a domain for "supremacy of his own will." *Id.* Plaintiffs rightfully challenge Defendants' overreach.

### B. *Roman Catholic Diocese of Brooklyn v. Cuomo* Signals a Clear Shift in Interpreting *Jacobson*.

Just four months after the Supreme Court issued its decision in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020), wherein it denied injunctive relief, the Court in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), signaled a fresh, sharper scrutiny towards government actions that infringe on constitutional rights during the pandemic.

In *Roman Catholic Diocese* the Court choose to enjoin Governor Cuomo's restrictions on houses of worship, even though the Governor argued the case was moot, *id.* at 68, the Court sought to make a resounding point: "even in a pandemic, the Constitution cannot be put away and

forgotten." *Id.* Justice Gorsuch, concurring, went further: "*Jacobson* hardly supports cutting the Constitution loose during a pandemic." *Id.* at 70 (Gorsuch, J., concurring). And further still: "*Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so." *Id.* Justice Gorsuch explicitly reject's *South Bay*'s interpretation of *Jacobson*. *Id.* at 71. He warns sternly: "[W]e may not shelter in place when the Constitution is under attack. Things never go well when we do." *Id.*

The Court in *Roman Catholic Diocese* makes clear that its future jurisprudence during this pandemic will be rooted in the Constitution, not in the expansive emergency powers in *Jacobson*. The Court did not limit its words to the First Amendment or to free exercise of religion. On the contrary, the Court spoke to the need for courts to vigilantly uphold all constitutional rights, even in emergency circumstances, and even when fear runs rampant.

### C. Plaintiffs Meet the Bars of Strict Scrutiny and Rational Basis.

Through their arbitrary requirements for remote learning and medical testing, Defendants have breached Plaintiffs' most fundamental rights: the right to give children a minimal education; the right to protect children from intrusive medical intervention; the right to protect children from unreasonable searches and seizures; the right to protect children's bodily integrity and privacy; the procedural right to challenge unlawful orders to isolate and quarantine children; and the right to authentic informed consent on behalf of children. Taken together, the harms Plaintiffs and their children suffer are profound and irreparable.

All of these abridged rights are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. *See Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997).

PBL\4821-3242-5183.v7-3/10/21

The Fourteenth Amendment's Due Process Clause recognizes certain interests are so substantial that no process is enough to allow the government to restrict them without a compelling state interest. *Id.* at 719–21. When it does so, it must do so in a narrowly tailored manner that is the least restrictive way possible. *See Bernal v. Fainter*, 467 U.S. 216, 219 (1984) ("In order to withstand strict scrutiny, the law must advance a compelling state interest by the least restrictive means available.").

The Constitution provides parents the right to direct the education and upbringing of their children. *See Washington*, 521 U.S. at 720 (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925)). Defendants have deprived Plaintiffs and their children the right to direct education in violation of the Fourteenth Amendment by effectively precluding children from receiving education and literacy because, among other reasons, remote learning is demonstrably inferior, as Defendants concede.

While Defendants have a compelling interest in public health, the weight of the evidence shows that children's transmission and infection rates do not justify mandating that students without symptoms undergo experimental testing to receive in-person education. That is particularly true when Defendants do not require the adults in the schools—teachers, staff, and administrators—to undergo such testing, even though they are ***far more likely*** than the students to be infectious, to spread the disease to other adults (and students), and to be seriously injured by the disease. To be blunt, Defendants' Test to Stay is not just irrational, it is *contrary to all known, prevailing science* on the subject—and certainly contrary to the CDC guidance it purports to rely upon.

But even if Defendants did test everyone, testing students without symptoms accomplishes nothing but risks substantial harm to students. As discussed above, Defendants' rapid antigen

testing is known to produce an unacceptable number of false positives—perversely the rate of false positives **_increases_** as the rate of spread in the community decreases. Under the prevailing conditions in Summit County over the recent past, Plaintiffs' expert has calculated that the majority of "positive" antigen tests at Defendant schools were false positives. But despite the faulty nature of these tests and the known error rates, all of the students who received one of these false positives was branded with the "Scarlet C" and sent home to quarantine while remote learning.

According to the CDC, Defendants can manage the infection risk to teachers by offering them choices and providing them protection, as employers do for other essential workers. The CDC urges schools to focus on these mitigation measures before turning to screening testing like Test to Stay.

Defendants' coerced testing and remote learning are crude measures. Implementing testing to make parents or others "feel comfortable" with in-person schooling is a poor basis for public policy—and it certainly cannot justify violating Plaintiffs' constitutional rights under a rational basis standard. If Defendants want to offer testing because it helps certain parents or other adults feel more comfortable, that testing should be, at a minimum, voluntary for everyone (not just teachers, staff, and administration).

In short, remote learning deprives children of the fundamental right to minimal education, while coerced testing invades fundamental rights to privacy, among others. Defendants should be enjoined from continuing to dig the graves for Utah's schools.

## IV.    THE BALANCE OF HARDSHIPS TIPS IN PLAINTIFFS' FAVOR.

In analyzing whether the balance of hardships favors the moving party, a court must determine whether the identified irreparable harm outweighs the harm to the opposing party if a

preliminary injunction is granted. *See Fish v. Kobach*, 840 F.3d 710, 754 (10th Cir. 2016). "When a constitutional right hangs in the balance, though, 'even a temporary loss' usually trumps any harm to the defendant." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019) (*citing* Wright et al., *supra*, § 2948.2 & n.10).

Furthermore, when plaintiffs seek an injunction to stay enforcement of a law or order that purportedly protects the public interest, the hardship to the government should be measured by the extent to which the law or order serves such protection. *See id.* at 802–03 (upholding district court's granting of motion for preliminary injunction enjoining government from enforcing its public nudity ordinance imposing criminal penalties for females who exposed their breasts in public other than for breastfeeding although government asserted that the ordinance promoted traffic safety, public order, and protected children from topless women).

Without an injunction, Plaintiffs' fundamental right to a minimum education will continue to be honored in the breach, whether in school with forced testing or in inferior remote learning. Defendants cannot argue credibly that the threat to public health from open schools without forced testing is great.

The rational basis test requires that the governmental action "bear[ ] a rational relationship to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). And actions which are irrational, arbitrary or capricious do not bear a rational relationship to any end. *See, e.g.*, *Cty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 169 (3d. Cir. 2006).

The Due Process Clause of the Fourteenth Amendment includes a substantive component that bars arbitrary, wrongful, government action "'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (citation omitted). The "core

of the concept" of substantive due process is the protection against arbitrary government action. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (citation omitted). Indeed, "[t]he touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 529, 558 (1974) (citing *Dent v. West Virginia*, 129 U.S. 114, 123 (1889)).

Here, there is literally nothing rational about Defendants' Test to Stay policy. Contrary to CDC guidelines, Defendants' policy uses a school-based outbreak threshold, rather than a community-based measure. The use of the specific school measure of purported COVID-19 cases exposes the inherent problems with existing PCR/NAATs testing, which terribly overestimates the number of infectious cases.

Then, contrary to CDC guidance, Defendants' policy mandates that all students must be tested, even though the CDC says testing should always be voluntary, never coerced, and that screening testing of schools can be wholly effective when only 10% of the student population is tested per sample. (CDC, *Operational Strategy* ("Schools may consider testing a random sample of at least 10% of students . . . for screening testing in areas of moderate and substantial community transmission.")).

Next, even though students are far less likely to become infected or to spread the disease to other students, whereas adults teachers, staff, and administration are far more likely to infected, spread the disease to other adults and students at the school, and become severely ill, Defendants' policy requiring that only students—but not staff—be tested is fundamentally irrational and contrary to the stated objectives of Defendants' Test to Stay policy.

Moreover, because the rapid antigen testing used by Defendants is known—particularly in circumstances as here, where community spread is relatively low—to produce ***more false positives***

***then actual positive results***, a substantial number of students will be quarantined and relegated to remote learning despite being completely healthy.

And finally, the entire premise of Defendants' policy—that they can detect asymptomatic students with COVID-19 and isolate them before they spread it—depends on the assumption that asymptomatic spread from students is an actual threat. But the science is unequivocal that mandatory screening testing of students without symptoms will not only fail to achieve any of Defendants' putative objectives with to Test to Stay——since students are not likely to spread COVID-19 even if they have it—but will undoubtedly subject a large but unseen number of students to the stigmatization—including remote learning—that comes with a false positive test.

### A. Defendants' Actions Violate Plaintiff's Fundamental Parental Rights.

As the Supreme Court has held, "[t]he liberty interest parents have in the care, custody, and control of their children is a substantive due process right protected by the Fourteenth Amendment" and is "'is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court.'" *U.S. v. White*, 782 P.3d 1118, 1138–39 (10th Cir. 2015) (brackets in original) (internal citations omitted); *see also Thomas v. Kaven*, 765 F.3d 1183, 1194–95 (10th Cir. 2014) (recognizing that the Fourteenth Amendment "protects the rights of parents to make decisions concerning the care, custody, and control of their children" and that this right provided "some level of protection for parents decisions regarding their children's medical care").

"The Fourteenth Amendment protects the right of parents to make decisions 'concerning the care, custody, and control of their children.'" *Doe v. Woodard*, 912 F.3d 1278, 1300 (10th Cir. 2019) (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). Parents have a fundamental right to direct the care and upbringing of their children, and medical decisions fall squarely within that

PBL\4821-3242-5183.v7-3/10/21

liberty interest. *Troxel*, 530 U.S. at 58 ("There is a presumption that fit parents act in their children's best interests; there is normally no reason for the State to inject itself into the private realm of the family to further question fit parents' ability to make the best decisions regarding their children."); *see also Parham v. J.R.*, 442 U.S. 584, 603 (1979) ("Simply because the decision of the parent . . . involves risks does not automatically transfer the power to make that decision from the parents to some agency or officer of the state. The same characterizations can be made for a tonsillectomy, appendectomy, or other medical procedure . . . . Parents can and must make those judgments."); *cf. Wallis ex rel. Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) ("family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state").

The state cannot interfere in or usurp parental rights to make medical decisions if the parents work with a licensed physician of their choosing. *Cf. Doe v. Bolton*, 410 U.S. 179, 199 (1973) (acknowledging constitutional principle parents must be able to make medical decisions for their children without interference from the state so long as they are supported by a state licensed physician even if the decision is controversial).

Parents also have a fundamental right to direct the education of their children and choose the type of education they believe is best. *See Meyer v. Nebraska*, 262 U.S. 390, 400; *cf Pierce v. Soc'y of the Sisters*, 268 U.S. 510 534–35 (1925) ("The child is not the mere creature of the state.") "In a long line of cases, [the Supreme Court has] held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the righ[t] . . . to direct the education and upbringing of one's children." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

### B. Defendants' May Not Condition In-Person Schooling on the Waiver of Rights to Informed Consent and Medical Privacy.

The "unconstitutional conditions doctrine" rests on the principle that "the government may not deny a benefit to a person because he exercises a constitutional right," *Reagan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983) (citation omitted), and works to "vindicate[ ] the Constitution's enumerated rights by preventing the government from coercing people into given them up [,]" *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

Utah's children are suffering deeply, whether they have been excluded or face the threat of imminent exclusion because of unwillingness to submit to coerced medical interventions. Each day without relief causes them to fall further behind and suffer more trauma. Deprivation of school is so universally recognized to cause lasting harm that courts routinely presume irreparable harm, even for short periods of exclusion, let alone what could be months of exclusion going forward if Defendants are not enjoined from continuing Test to Stay.

### C. Defendants' Actions Violate Plaintiffs' Rights to Equal Protection of the Law.

For purposes of equal protection claims, the rational basis test does not allow a party to probe the decision-making processes of the government because the Constitution "does not demand for purposes of rational-basis review that a legislative or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992). While the rational basis test is forgiving, the government action must still bear at least a rational relationship to some legitimate end. *Romer*, 517 U.S. at 631–32 (concluding that a referendum amendment to the state constitution violated the Fourteenth Amendment's equal protection because it "fail[ed], indeed defie[d]" to "bear[ ] a rational relation to some legitimate

25

end"). Rational basis review is a gentle standard for government acts, but it "is not a toothless one …." *Matthews v. Lucas*, 427 U.S. 495, 510 (1976).

Defendants have not proven the rationality of school exclusions and forced medical testing, nor have they proven the rationality of the differential treatment among Utah's school children. Park City does not have anywhere close to the greatest amount of community spread of COVID-19—the sole criteria the CDC says should be used to determine whether to implement mitigation measures such as screening testing—yet children at just two schools in Park City are bearing the full brunt of Test to Stay's invasive mandatory testing requirements. Beyond outbreak thresholds contrary to CDC guidance, Test to Stay provides no guidance or guardrails to local schools and school districts about *how and when* to implement mandatory testing, which has resulted in Plaintiffs' children are being subjected to unequal treatment for entirely irrational reasons. These decisions are being made by unelected officials without the scientific expertise to understand the ramifications of their decisions or whether those decisions are based on the current state of science. By definition, the differences in treatment permitted by Defendants' policies are irrational given the stated purposes for those policies.

### D. Defendants' Actions Violate Plaintiffs' Due Process Rights Under the Fourteenth Amendment.

"[T]he Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington*, 521 U.S. at 720–21 (citations omitted). Plaintiffs and their children have a fundamental right to a basic, minimum education. There could be no greater oxymoron than a government official, a school district, and educators claiming that education isn't a fundamental right.

26

Defendants have deprived Plaintiffs and their children of this fundamental right in violation of the Fourteenth Amendment by effectively precluding children from receiving a basic minimum education and their fundamental right to literacy for justifiable reason.

## V. PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.

Protecting Plaintiffs' constitutional rights serves the public interest. *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). It serves the public interest for children to be in school and free of coerced medical intrusions. As the Supreme Court observed nearly seventy-five years ago, "[t]oday, education is perhaps the most important function of state and local governments." *Brown*, 347 U.S. at 493. The vast learning differential between in-school and remote learning for children is indisputable, and "where the state has undertaken to provide it, [education] is a right which must be made available to all ***on equal terms***." *Id.* (emphasis added). While Defendants seem to concur that in-school learning is best for students, they continue to place significant hurdles in the way.

A preliminary injunction is the best—and only—way to open schools to all children, including those who refuse to participate in Defendants' compelled medical testing. Granting Plaintiffs' preliminary injunction protects not just Plaintiffs and their children but serves the broader public interest in education and the rule of law.

## CONCLUSION

Given the equities involved, Plaintiffs' legal remedies here are inadequate. Plaintiffs therefore respectfully request that the Court issue a preliminary injunction to enjoin Defendants from continuing Test to Stay and enjoin Defendants from barring children whose parents do not consent to coerced medical testing from in-person learning.

PBL\4821-3242-5183.v7-3/10/21

DATED March 10, 2021.

/s/ *Brandon J. Mark*
Brandon J. Mark
Gregory H. Gunn

PARSONS BEHLE & LATIMER

PBL\4821-3242-5183.v7-3/10/21