Brandon J. Mark, USB #10439
Gregory H. Gunn, USB #15610
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
Email: BMark@parsonsbehle.com
      DNeilson@parsonsbehle.com
      ecf@parsonsbehle.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MARK MCCLURE and HOLLY MCCLURE, Individually and as a Parents and Natural Guardians of M.M. and T.M.,<br><br>Plaintiffs,<br><br>vs.<br><br>SPENCER G. COX, in his Official Capacity as Governor of the State of Utah; RICHARD SAUNDERS, in his Official Capacity as Executive Director of Utah Department of Health; SUMMIT COUNTY BOARD OF HEALTH; CHRIS CHERNIAK, in his Official Capacity as Chair of Summit County Health Department; DR. SYDNEE DICKSON, in her Official Capacity as State Superintendent of Public Education; PARK CITY SCHOOL DISTRICT; DR. JILL GILDEA, in her Official Capacity as Superintendent of Park City School District; PARK CITY SCHOOL DISTRICT BOARD; ANNE PETERS, in her Official Capacity as member of Park City School District Board; ANDREW CAPLAN, in his Official Capacity as member of Park City School District Board; WENDY CROSSLAND; in her Official Capacity as member of Park City School District Board; KARA HENDRICKSON, in her Official Capacity as member of Park City School District Board; ERIN GRADY, in her Official Capacity as member of Park City School District Board. | **DECLARATION OF KEVIN MCKERNAN IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Case No. 2:21-cv-00148-CMR<br><br>Magistrate Judge Cecilia M. Romero |

I, Kevin McKernan, state as follows:

1. I am over the age of eighteen, and I can and do testify competently based on personal knowledge about the following matters.

2. A true and correct copy of my biography (Exhibit 1) and curriculum vitae (Exhibit

2

2) are hereby attached.

3. From 1996 to 2000, I was the Team Leader for Research and Development at the Whitehead Institute/MIT, Center for Genome Research. Our team designed and constructed the robotics and DNA amplification pipeline for the Human Genome Project efforts under the leadership of Eric Lander.

4. In 2000, I founded Agencourt Biosciences. This company sold viral and pathogen DNA purification kits and was the largest commercial DNA sequencing service company in the U.S. Beckman Coulter acquired this company in 2005, and during this acquisition, we jointly spun out a new entity (Agencourt Personal Genomics) to build a next generation sequencer known as the SOLiD Sequencer. The SOLiD sequencer was 100,000 times faster than the sequencer used to sequence the human genome in 1999. This new start-up was quickly acquired by the leader in DNA sequencing, Applied Biosystems, in 2006.

5. From 2006–2011, I managed the Next Generation sequencing R&D at Applied Biosystems and Life Technologies. This company was acquired by Thermo Fischer and is now the largest C19 testing reagent provider in the world. Thermo did $2B in C19 testing in the Q3- 2020 and is expecting 40% increases in Q4.

6. I hold many patents and peer reviewed articles on DNA sequencing, DNA and RNA isolation and PCR and was the CSO of Courtagen Life Sciences for 5 years. Courtagen was a CLIA and CAP certified high complexity laboratory that performed genetic testing on Children with Epilepsy, Autism and Mitochondrial disease. As a result, I have an intimate understanding of the medical experimentation and informed consent process required to perform genetic testing on symptomatic children.

7. I recently co-authored, along with 22 international authors who are among the world's leading experts in RT-PCR testing and pathology, a scientific article (Exhibit 3) demanding the retraction of a report regarding RT-PCR testing for SARS-CoV-2 by authors Corman and Drosten ("the Corman-Drosten paper") published in Eurosurveillance in January 2020 because of 10 major scientific flaws at the molecular and methodological levels. (Exhibit 3: Borger et al., *External peer review of the RT-PCR test to detect SARS-CoV-2 reveals 10 major scientific flaws at the molecular and methodological level: consequences for false positive results* (Nov. 2020), https://www.researchgate.net/publication/346483715.)

8. All Global PCR testing since the publication of the Corman-Drosten paper in February 2020 has been based on theoretical sequences of SARS-CoV-2 because the actual isolated genomic RNA was unavailable to the authors in February.

9. The review paper I co-authored points to several major concerns with the seminal Corman-Drosten paper regarding the global standard PCR protocol for diagnosis of SARS-CoV-2, including:

    a. Erroneous primer concentrations

    b. Unspecified primer and probe sequences

    c. The test cannot discriminate between the whole virus and viral fragments.

    d. The test cannot be used as a diagnostic for SARS-viruses.

    e. PCR data evaluated as positive after a Ct value of 35 cycles are completely unreliable.

    f. Scientific studies show that only non-infectious (dead) viruses are detected with Ct values of 35.

    g. The PCR products have not been validated at the molecular level with DNA sequencing, a "striking error of the protocol," making the test "useless" as a specific diagnostic tool to identify the SARS-CoV-2 virus.

      h.      Acknowledgement by the Corman-Drosten paper that it "generates false positives."

10.      The authors of the Corman-Drosten paper were also on the editorial board, constituting a clear conflict of interest. The paper has seen over 120,000 reads on Research Gate and is now being re-reviewed under a community retraction request. We have supplied examples of 20 peer reviewed scientific studies that demonstrate these flaws in Borger *et al*. (https://www.researchgate.net/publication/348406857_Addendum_-_Corman_Drosten_Review_Report_by_an_International_Consortium_of_Scientists_in_Life_Sciences_ICSLS)

11.      The paper was rushed through peer-reviewed in 24 hours. The average review time for Eurosurveillance is 179 days. (Exhibit 3.)

12.      The test lacks an internal control (RNaseP human target) so it cannot normalize for the 1,000-10,000 fold variance in swab sampling (Dahdouh et al https://pubmed.ncbi.nlm.nih.gov/33131699/).

13.      Although I am not specifically familiar with the PCR testing they are using in Utah laboratories, since the Corman-Drosten paper has become almost universally relied upon to establish testing procedures, it reasonable to expect that the laboratories in Utah are also basing their testing on similar qPCR concepts first described by Corman-Drosten et al. These alternative PCR protocols may share primers that target similar regions of the virus and suffer from the same deficits regarding the inability to discern infectious versus non-infectious patients.

14.      Even if a different qPCR protocol is being used in Utah, Mina *et al*. have recently published a manuscript titled "Clarifying the evidence on SARS-CoV-2 antigen rapid tests in public health responses to COVID-19 in the Lancet, which specifically addresses this issue. They state

> "In our view, current PCR testing is therefore not the appropriate
> gold standard for evaluating a SARS-CoV-2 public health test".

They come to this conclusion largely because qPCR tests can still be positive 77 days after infectiousness has past. This results in 5-10X more people being quarantined than necessary. (https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00425-6/fulltext).

15. PCR can test for the presence of viral RNA. PCR testing cannot test for viral infectiousness or illness. Further testing is required for positive test to see if they are truly positive for SARS-CoV-2 infection and the patient is in fact infectious. Patients can be qPCR positive for 77 days post infection. (Exhibit 4: Liotti FM, Menchinelli G, Marchetti S, et al., *Assessment of SARS-CoV-2 RNA Test Results Among Patients Who Recovered From COVID-19 With Prior Negative Results*. JAMA Intern Med. (Nov. 12, 2020), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2773053.) Complete live viruses are necessary for transmission, not the fragments identified by PCR. (Exhibit 5: T Jefferson, E A Spencer, J Brassey, C Heneghan, *Viral cultures for COVID-19 infectious potential assessment – a systematic review*, Clinical Infectious Diseases, ciaa1764, OXFORD UNIVERSITY PRESS (Dec. 3, 2020), https://academic.oup.com/cid/advance- article/doi/10.1093/cid/ciaa1764/6018217.)

16. The infectious period of this virus is only 7–10 days. Both asymptomatic and symptomatic spread of the school age group is rare as most don't develop symptoms. This means the majority of positive students will be falsely identified as infectious by this test. These students are not informed of this deficit of qPCR testing.

17. I have extensive experience in human subject research and the requirements of informed consent. I fully understand the requirements necessary for human subjects, and for parents on behalf of children, to be able to give prior, free and informed consent to any medical procedure

(not just experiments), the hallmark of ethical medicine.

18. I concur with the findings of Exhibit 4 that long periods of PCR positivity exist weeks to months past infectiousness. These are poorly designed PCR tests will erroneously identify as infectious mostly non-infectious people. (Exhibit 4: Liotti FM, Menchinelli G, Marchetti S, et al., *Assessment of SARS-CoV-2 RNA Test Results Among Patients Who Recovered From COVID-19 With Prior Negative Results*. JAMA Intern Med. (Nov. 12, 2020), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2773053.)

19. I also concur with these findings of Borry et al. that:

> As presymptomatic or predictive genetic testing may have far-reaching consequences for test applicants, their family members and society, concerns have always been raised about the pre-test and post-test counselling process, the provision of adequate information, the private and confidential character of the test result, the psychosocial impact of a test and the responsibility towards blood relatives. An even more cautious approach has been envisaged when considering such testing in children and adolescents. This originates from the fear that testing in childhood or adolescence could create devastating social, emotional, psychosocial and educational consequences in the child or in the adolescent."

(Exhibit 6: Borry, P., Evers-Kiebooms, G., Cornel, M. et al., *Genetic testing in asymptomatic minors*, EUR J HUM GENET 17, 711–719 (2009) (footnotes omitted), https://www.nature.com/articles/ejhg200925.)

20. This peer reviewed Nature article by Borry et al goes on to conclude:

> In respect of national legislation, minors should be able to decide personally regarding a genetic test when they are well informed, have an adequate understanding of the test and its potential consequences, have the capacity to make this decision, are not exposed to external pressure and have had appropriate counselling.

*Id*.

21. I see none of these informed consent features in mass genetic testing of asymptomatic minors as an educational requirement.

22. It is my opinion that unless an authority using PCR testing fully discloses the parameters of its lab testing, such as the number of cycles it is using and the primers, it is impossible to fully assess what the authority is actually doing with the samples.

23. Because manipulation of the Ct or cycle threshold determines the number of positive tests, most current testing practices leave open the possibility for arbitrary and capricious state or private actions to effectively close certain schools with a high positivity rate or to keep certain schools open with low positivity rates.

24. "Consent" is not properly considered "consent" to the extent that refusal to submit to testing results in eviction from any in-person schooling until "consent" is given. Requiring "consent" to continue in in-school participation amounts to coercion of parents' consent on threat of deprivation of in-person education.

25. If an authority has failed to provide documentation of its contracts with testing providers that prove that they are not selling or cataloguing students' and teachers' genetic material, then parents cannot give true informed consent. Such knowledge of how the genetic material is being used is a meaningful part of informed consent.

26. The scientific literature on SARS-CoV-2 makes it clear that children are the least likely group in society to become ill from COVID or to transmit disease. For children it is lower than annual influenza risk. The Infection fatality rate for infants to 19 year-olds, according to the CDC, is 0.00003. (Exhibit 7: COVID-19 Pandemic Planning Scenarios, CDC.GOV, (Sept. 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.)

27. There is no science to suggest that testing asymptomatic children has *any* benefit to society.

28. On the contrary, there is significant evidence that such testing:

   a. "clogs the system," making it less likely that symptomatic carriers are detected and isolated;

   b. Burdens the schools and children, taking time away from curricular activities;

   c. Harms children psychologically by depriving them of the comfort and security of their parents and family physicians during such testing;

   d. has no empirical support for the claim that it is protective of the whole school body.

29. As a scientist who runs a testing company, I am in no way opposed to testing.

30. Intelligent, useful testing and infection control measures in this situation would include:

   a. A focus on symptomatic testing.

   b. Age stratified testing priority since the elderly have 1000 fold higher risk than children.

   c. Transparent use of qPCR protocols that have been properly calibrated to know Ct predictiveness of infectiousness as seen in Jaafar et al. This requires public Ct scores and EUA documentation of the limit of detection on the tests being utilized.

   d. Elimination of asymptomatic testing on people who have had no contact with Covid 19.

   e. Medical testing to call a 'case' requires physician review with symptoms. A single test can never be utilized to call a medical case without proper medical review of the patient.

31. It is my opinion that voluntary testing of the adult teacher population on demand—as they are at higher risk of infection—would be a more appropriate solution.

32. As with all medical testing, physicians should be consulted to interpret the results.

33. A positive or negative qPCR test in absence of any clinical data was never considered a medical test in 2019. This is even more important when the tests are not diagnostic grade. These are flawed Research Use Only tests (with rapid) been deployed on asymptomatic children used to falsely identify them as infectious when they are not. This is causing physical and emotional harm to adolescents and is an embarrassment to medical testing ethics.

34. There are far less invasive solutions that would yield far better results, including temperature testing, RAT tests, and requiring that all symptomatic people—students, teachers, and staff alike—stay home.

I declare under criminal penalty of the State of Utah that the foregoing is true and correct. Executed this _9th_ day of March 2021.

/s/ Kevin J McKernan (executed via email)  
Mr. Kevin McKernan